# IN THE COURT OF APPEALS 10/29/96

# OF THE

# STATE OF MISSISSIPPI

## NO. 93-CA-00726 COA

RICHARD A. KNUTSON

APPELLANT

v.

JANET T. KNUTSON

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. GERALD E. BRADDOCK

COURT FROM WHICH APPEALED: WASHINGTON COUNTY CHANCERY COURT

ATTORNEY FOR APPELLANT:

RABUN JONES

ATTORNEY FOR APPELLEE:

WILLIARD L. MCILWAIN, JR.

NATURE OF THE CASE: CIVIL

TRIAL COURT DISPOSITION: DIVORCE GRANTED

BEFORE THOMAS, P.J., MCMILLIN, AND PAYNE, JJ.

THOMAS, P.J., FOR THE COURT:

Janet T. Knutson was granted a divorce from Dr. Richard A. Knutson on the ground of habitual cruelty. In the final divorce decree, the trial court ordered Dr. Knutson to pay Mrs. Knutson $4,100.00 per month in child support as well as to pay all reasonable and necessary medical, dental, orthodontic, optical, and drug expenses for the minor children. Additionally, the court ordered Dr. Knutson to pay alimony in the sum of $1,000.00 a month until Mrs. Knutson's remarriage or death. The court further found that Mrs. Knutson was entitled to a fair and equitable distribution of the property.

From this order, Dr. Knutson appeals to this Court asserting four alleged errors. Those alleged errors being:

I. WHETHER THE TRIAL COURT ERRED IN GRANTING A DIVORCE TO MRS. KNUTSON ON THE GROUND OF HABITUAL CRUELTY.

II. WHETHER THE TRIAL COURT ERRED IN MAKING ITS EQUITABLE DIVISION OF THE ASSETS OF THE PARTIES, AND FAILING TO CONSIDER THE $115,000.00 DEBT OF RICHARD KNUTSON TO DELTA SWAMPLAND, INC. AS A VALID DEBT.

III. WHETHER THE COURT ERRED IN REQUIRING DR. KNUTSON TO ASSUME SOLE RESPONSIBILITY FOR THE HUGE TAX DEBT OF THE PARTIES IN EXCESS OF $180,000.00.

IV. WHETHER THE COURT ERRED IN ITS AWARD OF ALIMONY AND CHILD SUPPORT.

Finding no error, we affirm.

FACTS

Dr. Richard A. Knutson, an orthopedic surgeon, formed the Delta Orthopedic Clinic in 1976. After starting this clinic Dr. Knutson hired his future wife Janet Knutson who was a registered nurse. This professional relationship ultimately matured into a marriage some five years later in November of 1981.

Over the space of seven years, six children including two sets of twins were born to the parties, the oldest child being ten and the youngest three at the time of trial. As the family was rapidly growing, the Knutsons in September of 1984 moved from a smaller home on Washington Avenue, which was owned solely by Dr. Knutson, into a larger home on Idlewild Drive, which was titled in both parties' names.

MARITAL PROBLEMS

The Knutsons began experiencing marital problems; Dr. Knutson slept on the couch for the last nine years of the marriage, and the parties did not communicate for months at a time. However, even more serious problems began in December of 1988.

On one December night, Dr. Knutson approached Mrs. Knutson, who was in bed asleep and fully clothed, and demanded sex. When Mrs. Knutson refused, Dr. Knutson tore at her clothing and grabbed her hair and ears and began beating hear head on the mattress. Dr. Knutson denies beating her head on the mattress but admits to pulling her hair. This incident prompted Mrs. Knutson to move herself and her children into her mother's home. The parties later resumed cohabitation and had a few good months together before additional problems arose.

Since May of 1989, neither party had told the other that "I love you" or even kissed the other. Mrs. Knutson admitted that she stopped loving Dr. Knutson four or five years prior to the separation in 1992. According to Mrs. Knutson, she began sleeping fully clothed in her bedroom hoping to discourage sexual relations with Dr. Knutson because of his verbal abuse of her. Mrs. Knutson also regularly had one or more of the younger children sleep with her.

During the later periods of the marriage, sexual contact between the parties became increasingly infrequent. Dr. Knutson estimated that the average sexual contact with Mrs. Knutson was once a month. According to Mrs. Knutson, Dr. Knutson would curse and berate her and then demand sex. She stated that there were numerous instances in which he forced her to have sex. On a number of occasions, Dr. Knutson would move a sleeping child over to another portion of the bed, would then have sex with his wife, and then return to the couch. Mrs. Knutson stated that ninety percent of the time that the parties engaged in sexual intercourse, she was in tears.

A further example of the coolness between the parties is illustrated by the fact that according to Mrs. Knutson, Dr. Knutson refused to take her to obtain medical help on several occasions. Two of those occasions occurred while Mrs. Knutson was pregnant. In one instance, even though Mrs. Knutson was in pain and was running a high fever, Dr. Knutson did not take her to the hospital. Instead, Mrs. Knutson's mother had to drive her to the doctor in Indianola, Mississippi, where it was learned that her baby was dead. Dr. Knutson did not recall any refusal to obtain medical help for his wife.

On another occasion, Mrs. Knutson, while alone in the kitchen, slipped and fell on the kitchen floor. In severe pain and unable to get up, Mrs. Knutson saw Dr. Knutson enter the room and stare at her for thirty to forty-five seconds. Making no attempt to help Mrs. Knutson, Dr. Knutson turned around and walked out of the kitchen. According to Dr. Knutson, the expression on Mrs. Knutson's face warned him that he would have been in trouble whether he had helped her up or not.

While Mrs. Knutson admitted that Dr. Knutson had never committed any violent acts toward the children, on one occasion at a soccer match, Dr. Knutson knocked down his eight-year-old daughter Allison after she had accidentally done the same to him. As the child was attempting to help him up, Dr. Knutson admonished her "not to act like a damned jackass."

After the culmination of many years of verbal and sexual abuse, Mrs. Knutson, on February 9, 1992, requested a divorce. On that occasion, while talking about the divorce Dr. Knutson declared that he would go to jail before he gave her or the children a dime. He further stated that the children could no longer attend private school and that he would go bankrupt. It was also during this discussion that

Dr. Knutson added the comment that if his financial situation did not improve that he would commit suicide. This conversation occurred in front of the children.

The subject of Dr. Knutson's suicide reoccurred again on a later occasion when Dr. Knutson stated that his family would be better off if he were dead. These conversations of suicide caused Mrs. Knutson, along with all of the children, to sleep in one room. After Mrs. Knutson overheard Dr. Knutson contemplating the purchase of *two* cemetery plots Mrs. Knutson began sleeping with a pistol under her pillow. Dr. Knutson stated that the purchase of these two cemetery plots was unrelated to the comments he made about suicide.

In May of 1992, two to three weeks after learning of the purchase of the two cemetery plots, Mrs. Knutson, afraid for her life at this point, took the children and moved out of the marital dwelling and into her mother's house.

FINANCIAL SITUATIONS

At the time of trial, Dr. Knutson's 1992 tax return had not been completed; however, his gross income for that year was approximately $370,000.00. For that year, he paid himself in withdrawals the sum of $48,250.00. In addition, Dr. Knutson paid Delta Swampland, Inc., his solely owned corporation, $26,750.00 for renting the office space for his clinic. In addition, Dr. Knutson paid numerous personal expenses out of the business in the amount of $79,401.00. He also paid $2,000 per month in support payments to Mrs. Knutson out of Delta Swampland proceeds by categorizing Mrs. Knutson as an employee.

Dr. Knutson had been promoting an invention called "Sugardyne" for some seventeen years and had spent roughly $600,000.00 to $1,000,000.00 on promotion of this invention but had not netted any profit therefrom.

The Knutsons owned two homes. One home, which was located on Washington Avenue, was owned by Dr. Knutson prior to the parties marriage and was worth approximately $70,000.00 with approximately $65,000.00 in equity. The other home, which was on Idlewild and which was bought during the course of the marriage, was worth approximately $175,000.00 with approximately $32,000.00 in equity.

Dr. Knutson's solely owned corporation, Delta Swampland, Inc., had two warehouses and a lot downtown. He also owned one-half interest in eighty acres near Hot Springs, Arkansas.

Dr. Knutson had a nautical antique collection worth roughly $50,000.00 to $60,000.00. He also owned a gun collection worth approximately $134,000.00. Dr. Knutson also testified that he collected old Cadillacs and had six or seven of them.

Dr. Knutson testified that while his clinic's gross income for 1992 was approximately $31,000.00 per month, the prospects for 1993 were not as bright due to increased competition from a new orthopaedic clinic in Greenville. The trial court made a finding that in 1992 Dr. Knutson's net income before taxes was $97,475.00. However, included in Dr. Knutson's expenses which were deducted from his gross income were $24,000.00 in wages he paid to Mrs. Knutson for support, payment of one-half of Mrs. Knutson's social security, legal fees for patents for which no monetary gain has been

derived in seventeen years, and life insurance and disability insurance premiums of $15,860.00.

Mrs. Knutson had a savings account of approximately $30,000.00 which had come from various sources. These funds had been secreted away from Dr. Knutson during their marriage. Mrs. Knutson stated that all of this money had been spent on support for herself and her children. Dr. Knutson evaluated Mrs. Knutson's property between $83,582.00 and $87,632.00.

Mrs. Knutson testified that the expenses for her and her six children amounted to $8,087.00 per month.

BANKRUPTCY

In early 1992, the IRS informed Dr. Knutson that he owed the government a sum in excess of $180,000.00. It was during this time that the trial court ordered Dr. Knutson to pay approximately $7,500.00 to $8,000.00 to Mrs. Knutson for temporary support. Unable to further comply with that decree and fearing IRS seizure of his assets, Dr. Knutson filed for a Chapter 11 Bankruptcy.

The bankruptcy petitions and schedules point out that Dr. Knutson's assets total $533,110.00 and his known liabilities total $324,031.54. However, these liabilities did not include the $180,000 IRS lien. While at the time of trial Dr. Knutson's bankruptcy plan had not been filed, Dr. Knutson estimated that he would be called upon to pay roughly $5,000.00 to $7,000.0 per month to maintain the bankruptcy and that his art, nautical antiques, and gun collection would have to be liquidated in order to pay his creditors. Dr. Knutson further testified that he had outstanding approximately $15,000.00 to $18,000.00 in legal expenses that he owed to his bankruptcy and divorce attorney.

TRIAL COURT'S FINDINGS

The trial court made the following findings of fact, in pertinent parts:

The proof shows and the Court so finds that Husband subjected Wife to verbal abuse with profanity during the marriage and insisted on sexual engagements with Plaintiff over Plaintiff's protestations and at times when one or more of the minor children of the parties were in the same bed, all to the humiliation and embarrassment of the Plaintiff. The Court further finds that said sexual engagements by Defendant with Plaintiff over Plaintiff's protests resulted in physical harm to Plaintiff, particularly one occasion where hair was pulled from Plaintiff's scalp. The proof shows and the Court so finds that Defendant took a total cavalier and unconcerned attitude towards Plaintiff at times of major crisis. At the time of Plaintiff's miscarriage, Defendant refrained from transporting Plaintiff to a physician when Plaintiff requested on the morning of the day of the miscarriage, and Plaintiff had to obtain other transportation and Defendant did not check on Plaintiff until the evening of the miscarriage. On several occasions, Defendant would be gone without Plaintiff knowing his whereabouts, and Plaintiff could not locate Defendant and utilities to the home of the parties would be cut off for nonpayment, even though Defendant was earning substantial income and there was no cause nor justification for submitting Plaintiff and the minor children to such indignity and mental suffering. The Court finds and admitted to by the Defendant that Defendant discussed possible suicide with Plaintiff which was most upsetting and frightening to Plaintiff with such statements and other actions of Defendant caused Plaintiff to fear for her safety, with Plaintiff sleeping with a gun under her pillow.

The Court finds that the actions of the Defendant were habitual and continuous over a major portion of the marriage and were so unkind and unfeeling as to cause Plaintiff mental suffering and put Plaintiff in reasonable apprehension or danger for her safety and rendered further cohabitation impossible and constitutes cruel and inhuman treatment toward Plaintiff. Plaintiff will be awarded a divorce absolute from Defendant on the grounds of habitual cruel and inhuman treatment.

In the final divorce decree Mrs. Knutson was awarded the home on Washington Avenue. Dr. Knutson was ordered to pay the remaining $4,675.00 left on the first mortgage and $7,000.00 remaining on the second mortgage. Dr. Knutson was awarded the Idlewild residence and ordered to assume the indebtedness remaining on that residence.

The trial court further ordered an equitable distribution of the property. The trial court found that "40% of the value of the firearms, 40% of the value of the nautical collection and 55% of the value of the artwork was acquired during the course of the marriage" and that the parties be ordered to equitably divide the items.

Dr. Knutson was ordered to pay $4,100.00 per month in child support and $1,000.00 per month in alimony. Dr. Knutson was also ordered to pay all reasonable and necessary medical, dental, orthopedic, optical, and drug expenses of the minor children. Dr. Knutson was also ordered to pay Mrs. Knutson $7,000.00 toward the payment of her attorney's fees.

DISCUSSION

I. WHETHER THE TRIAL COURT ERRED IN GRANTING A DIVORCE TO MRS. KNUTSON ON THE GROUND OF HABITUAL CRUELTY.

Dr. Knutson argues that the trial court erred in granting a divorce for habitual cruelty on the ground that Mrs. Knutson failed to meet her burden of proof. Our supreme court in *Wilson v. Wilson*, 547 So. 2d 803 (Miss. 1989), set forth level of proof needed to obtain a divorce for habitual cruelty. The court held:

> [H]abitual cruel and inhuman treatment could be established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said to be a permanent condition.

*Id.* at 805.

From a careful reading of the above facts, it is clear that Mrs. Knutson was entitled to a divorce for habitual cruelty. The forced sex, abusive language, instances of unconcern toward Mrs. Knutson's physical condition, the threats of suicide, and the remaining behavior exhibited toward Mrs. Knutson

go well beyond mere rudeness or unkindness. Such actions amount to habitual cruelty, and we find the trial court's finding of habitual cruelty to be proper.

II. WHETHER THE TRIAL COURT ERRED IN MAKING ITS EQUITABLE DIVISION OF THE ASSETS OF THE PARTIES, AND FAILING TO CONSIDER THE $115,000.00 DEBT OF RICHARD KNUTSON TO DELTA SWAMPLAND, INC. AS A VALID DEBT.

After hearing all of the evidence concerning the parties financial condition, the trial court made a finding that the realistic net worth of Dr. Knutson was $255,000.00. Dr. Knutson argues that in coming to this figure the trial court failed to consider Dr. Knutson's $115,000.00 debt owed to Delta Swampland, his solely owned corporation, as well as the $180,000.00 IRS tax lien. Dr. Knutson argues that instead of finding a net worth of $255,000.00, the trial court should have found a negative net worth. Therefore, he argues that because the trial court erred in calculating his net worth, the trial court's distribution of the marital property was unequitable.

On the other hand, Mrs. Knutson argues that the division of the property was equitable. She asserts that Dr. Knutson leaves the marriage with exclusive title to the $175,000.00 Idlewild home with $32,000.00 in equity, all of the guns, nautical antiques, and art work that he collected prior to the marriage, plus one-half of those items accumulated after the marriage, all of his interest in the Sugardyne corporation on which he placed a value of $747,510.00, all of his one-half million in accounts receivable, all of the property owned by Delta Swampland, Inc. (an office, two warehouses, and a lot in downtown Greenville), all of the Cadillacs he collected, a Toyota Land Rover, and one-half interest in eighty acres near Hot Springs, Arkansas.

Mrs. Knutson, on the other hand, leaves the marriage with the smaller, older house on Washington Avenue with approximately $65,000.00 in equity, a 1984 Chrysler Van with 140,000 miles, one half of the value of the gun collection, nautical antiques, and art work accumulated after the marriage, and $1,000.00 per month in alimony.

The law in this state is clear. If the martial property was accumulated through the joint efforts and contributions of the parties, then the chancery court has the authority to order an equitable distribution. *Brown v. Brown*, 574 So. 2d 688, 690 (Miss. 1990). "This Court will not disturb those findings, unless manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Faries v. Faries*, 607 So. 2d 1204, 1208 (Miss. 1992).

In this case, the chancellor made a finding that there should be an equitable distribution of the marital property that was acquired after the parties marriage. This was within his discretion, and this Court will not disturb such a finding.

As to the Washington Avenue home, Dr. Knutson argues that the chancellor's grant of this home to Mrs. Knutson was in error because the proof showed that Dr. Knutson owned this home prior to the couple's marriage. "While it is a general rule of law that the chancery court cannot divest a spouse of title to property, thereby forcing that spouse to deed such property to the other spouse, it is not an absolute rule." *Draper v. Draper*, 627 So. 2d 302, 305 (Miss. 1993).

In this case, the chancellor made a finding that "[t]he proof shows even though Defendant purchased the Washington Avenue home prior to the marriage, Wife worked and assisted Defendant and contributed to Defendant's being able to continue the mortgage payments and create equity now held in the home and contributed monies she brought into the marriage in renovations to the home."

We find that the chancellor's grant of the Washington Avenue home to Mrs. Knutson was proper and equitable. The Washington Avenue home had $65,000.00 in equity at the time of trial, $45,000.00 of which was contributed during the couple's marriage. While it is true that Mrs. Knutson is apparently receiving $20,000.00 in equity that Dr. Knutson had in the home prior to the marriage, this is balanced by the fact that Dr. Knutson was awarded the $175,000.00 Idlewild home with $32,000.00 in equity, all of which was contributed during the marriage.

We find no error in the equitable distribution of the property. In fact, it appears to this Court that Dr. Knutson received the greater share of the couples's assets.

III. WHETHER THE COURT ERRED IN REQUIRING DR. KNUTSON TO ASSUME SOLE RESPONSIBILITY FOR THE HUGE TAX DEBT OF THE PARTIES IN EXCESS OF $180, 000.00.

During a five-year period of the couple's marriage, neither party filed a tax return. The taxes, penalties, and interest for the failure to pay taxes amounted to roughly $180,000.00.

Dr. Knutson argues that the trial court's mandate requiring him to bear the burden of the entire $180, 000.00 IRS tax lien is unequitable. Particularly, Dr. Knutson argues that such ruling is unequitable considering that during the course of their marriage "Mrs. Knutson maintained a secret account at Security Savings and Loan and the income earned by that account (and unknown to Dr. Knutson) was not reported to the IRS (thus presumably this hidden interest will be a portion of the debt that Dr. Knutson will be required to pay)."

We find no error here. The IRS tax lien is a debt that the chancellor could assign to any party or both as long as the chancellor did not act inequitable. It is safe to assume that since Mrs. Knutson is unemployed, it would be all but impossible for her to repay any amount of a monetary debt. On the other hand, Dr. Knutson, who was allowed to keep a majority of the couple's assets, would be in a better position to repay this debt.

The long standing rule in this state is that the findings of the chancellor will not be disturbed unless those findings were manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. *See Faries*, 607 So. 2d at 1208. The chancellor's distribution of the couple's assets and liabilities was equitable. We find no error here.

IV. WHETHER THE COURT ERRED IN ITS AWARD OF ALIMONY AND CHILD SUPPORT.

The facts presented at the lower court show that in 1992 Dr. Knutson's gross income was approximately $31,000.00 per month. The trial court made a finding that in 1992 Dr. Knutson's net

income before taxes was $97,475.00. However, included in Dr. Knutson's expenses which were deducted from his gross income was $24,000.00 in wages he paid to Mrs. Knutson for support even though she was not working for him. If the amount of money Dr. Knutson paid Mrs. Knutson for support is added back to his income, plus the payments for her social security, then Dr. Knutson's income for the year 1992 was approximately $122,000.00.

Dr. Knutson argues here that the $5,100.00 total that he pays in child support and alimony goes beyond Mrs. Knutson's needs and his ability to pay. First, $5,100.00 does not go beyond Mrs. Knutson's needs. Mrs. Knutson, unemployed with six children, showed at trial a monthly living expense of $8,087.00 for her and the children. The chancellor took this information and reduced it to $5,100.00. We find that the amount the chancellor awarded for alimony and child support was not beyond Mrs. Knutson's or the children's needs.

Second, Dr. Knutson's payment of $5,100.00 per month in alimony and child support does not go beyond his ability to pay. The payment of $5,100.00 per month would be roughly one-half of Dr. Knutson's monthly net income. While paying fifty percent of one's net income for child support and alimony may seem high, it should be understood that Mrs. Knutson, who is unemployed, must also bear the responsibility of supporting all six children.

This Court is required to uphold the decisions made by a chancellor unless those decisions are manifestly wrong or unsupported by the evidence. *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990). "This is particularly true in the areas of divorce, alimony and child support." *Magee v. Magee*, 661 So. 2d 1117, 1121 (Miss. 1995); *see also Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992); *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989). Under this standard of review, this Court cannot say that the chancellor's decisions in this case were erroneous.

**THE JUDGMENT OF THE CHANCERY COURT OF WASHINGTON COUNTY IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. COSTS OF APPEAL ARE TAXED TO THE APPELLANT.**

**FRAISER, C.J., BRIDGES, P.J., BARBER, COLEMAN, DIAZ, McMILLIN, PAYNE, AND SOUTHWICK, JJ., CONCUR.**

**KING, J., NOT PARTICIPATING.**