## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 94-CA-01293-SCT

*DWIGHT CARROLL SANDLIN*

*v.*

*NANCY R. SANDLIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/30/94 |
| TRIAL JUDGE: | HON. WILLIAM ROBERT TAYLOR, JR. |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY |
| ATTORNEY FOR APPELLANT: | ROBIN ROBERTS |
| ATTORNEY FOR APPELLEE: | EUGENE L. FAIR |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 3/27/97 |
| MOTION FOR REHEARING FILED: | 4/10/97 |
| MANDATE ISSUED: | 6/26/97 |

**BEFORE PRATHER, P.J., AND PITTMAN AND SMITH, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Nancy and Dwight Sandlin, parties herein, agreed to a divorce on the grounds of irreconcilable differences. In lieu of personally appearing before the chancellor, both parties testified by affidavit. The affidavits comprised the only testimony given by either side. The parties both agreed that they would abide by the decision of the chancellor in the division of marital assets, because they could not agree between themselves. The chancellor took both affidavits, along with supporting documents and rendered his decision, awarding practically all of the marital assets to Nancy, along with a substantial portion of her attorney's fees, and an order that Dwight pay all debts remaining from the marriage. In addition, the chancellor awarded the Nancy forty percent of Dwight's Gannett Stock bonuses and thirty percent of his retirement plan. Aggrieved, Dwight Sandlin appeals.

### FACTS

¶2. As in almost any divorce case, there are two stories. The truth is probably somewhere in between.

### NANCY'S STORY

¶3. Dwight and Nancy Sandlin met in Coco, Florida in 1981 while he was working at a Gannett-owned newspaper and she worked part-time at the paper to earn money for Christmas. Dwight had a

son from a previous marriage who, from all indications, did not live with him. Nancy had two adolescent daughters, Michelle and Sherri. Nancy worked for the Brevard County Board of Commissioners and was enrolled in the Florida State Retirement System. Both Nancy and Dwight owned separate homes.

¶4. In August, 1982, Dwight was transferred to Gainesville, Georgia. Soon afterwards, the two of them decided to get married, so Nancy quit her job and moved to Gainesville to be with Dwight. Nancy sold her Florida home for a net profit of $4,100. Dwight rented his Florida home out and continues to do so.

¶5. In December, 1982, Nancy began working for Leon Farmer & Company in Gainesville and enrolled in the company's private retirement system. Dwight and Nancy married in May, 1983, in Lawrenceville, Georgia. According to Nancy, in September, 1983, they bought a home in Gainesville with the proceeds of the sale of Nancy's Florida home.

¶6. In November, 1984, Dwight was fired from his job with the Gainesville Times and was transferred by Gannett to Arlington, Virginia to work on special projects. This was a temporary assignment, and the company flew him home to Georgia every weekend to be with his family. Nancy remained in Georgia due to the uncertainty of his job status and the fact that Sherri was doing well in school and Nancy did not want to remove her. Michelle did not adjust to life in Georgia and went to live with her grandmother in California.

¶7. Dwight offered Nancy no support during the time that he lived in Virginia except $35 per month to pay her Shell gasoline bill. Nancy supported herself and her daughter from her income of about $17,000. Meanwhile, Dwight's income was about $50,000.

¶8. In 1986, Gannett offered Dwight a permanent position in Virginia. The marriage was very tense at that point in time, and Nancy felt that Dwight was not being communicative. In 1986, the couple sold their marital home in Georgia. Nancy mailed the proceeds of $9,000 to Dwight in Arlington. He bought a small house for Nancy and Sherri to live in with $3,000 as down payment. He used the remainder to buy a cabin in Virginia for $75,000. Nancy has always paid the note of $449 on the Georgia home.

¶9. Nancy filed for a divorce in 1987, feeling that the marriage was a lost cause. When Dwight was served with the divorce papers he did not wish to be divorced, so they reunited. Nancy moved to Virginia in March of 1988, leaving Sherri to live with a friend in Gainesville so that she could graduate with her high school class. Nancy began to work with an electrical contracting company.

¶10. In October, 1988, Dwight was transferred to Hattiesburg, Mississippi to work for the *Hattiesburg American.* The couple sold the Virginia cabin for $125,000. They used the proceeds from the sale of the cabin to make the down payment on the marital home in Hattiesburg. Nancy began working for a private duty nursing company and in December, 1989, for Forrest General Hospital.

¶11. In January, 1991, Dwight resigned under pressure from his position at the *Hattiesburg American* due to personality differences with the new publisher. He collected six months severance pay. Dwight did not try to find another job for one year, and the household income decreased by $4,000 per

month. The renters on both the Florida home and the Georgia home each got three to four months behind on rental payments. Since Nancy's net pay was only $1,300 per month and the mortgages on all three homes was $1,200, the savings were quickly depleted. In February, 1992, Nancy and Dwight bought a commercial print shop in Laurel. Dwight sold $12,000 worth of Gannett stocks issued during the marriage to make the down payment. Nancy signed a note using her income to qualify to assume the SBA loan.

¶12. On August 12, 1993, Nancy and Dwight separated in Lamar County. Nancy filed for divorce. The temporary hearing allowed both of them to retain possession of the marital home. Nancy claimed that life was unbearable and that Dwight's behavior forced her to move out of the home. He said that he was not moving, but if she wanted this divorce, then she could move. She bought a HUD home for herself and Sherri for $100 down payment, and $307 per month. She and Dwight divided the furniture, then she , Sherri, and Sherri's three year-old son moved out of the marital home. The HUD home is titled in Nancy's name only, whereas the other homes were titled in both her name and Dwight's name.

## DWIGHT'S STORY

¶13. Dwight's side of the story mirrors Nancy's up to the point of his promotion and transfer to Gainesville. At that point, their tales diverge.

¶14. After they agreed that the two daughters would come to Gainesville with Nancy, Nancy told Dwight that sixteen year old Michelle was pregnant. Dwight agreed that it would be okay for Michelle and the baby to live with them. Michelle had her baby in January of 1983. Dwight had put Nancy and the girls on his health insurance through his employer, but the pregnancy was not covered. According to Dwight, the money from the sale of Nancy's home was used on hospital bills, doctor bills, and other items needed for the baby, not as a down payment for the home which they eventually purchased in Gainesville. Dwight sold both his bass boat and his air boat to be able to furnish and make payments on the Gainesville home.

¶15. Nancy decided to move her mother and sister from Miami to Gainesville so that they could be closer and the Sandlins could help look after them. The Sandlins helped Nancy's family buy a new house trailer and set it up in a mobile home park not far away from where the Sandlins lived. The Sandlins helped with the financing and set-up of the trailer, co-signing the mortgage. A few months later, when the Sandlins went by for a visit, they found the lot empty. Nancy's family had taken the trailer and moved back to Miami. Throughout the marriage, the Sandlins had contributed to Nancy's mother and sister's upkeep, sending money every month, maintaining insurance policies and helping out in emergencies. They did likewise for Michelle in California, and helped her move to Hattiesburg. They even contributed $1,700 for drug rehabilitation for Nancy's mother. The contributions were enough that the Sandlins claimed Nancy's mother and sister on their income taxes yearly.

¶16. In November, 1984, Dwight transferred to Gannett headquarters in Virginia. Due to the fact that Sherri was doing well in school, and the temporary nature of the Virginia assignment, the family decided that Nancy and Sherri would remain in Georgia. In April, 1985, Dwight was offered a permanent position on the corporate staff of Gannett, which he accepted. He asked Nancy if she wanted to move to Virginia, but she did not want to do so. This was during the period in which he was flying back and forth to Georgia on weekends. Contrary to Nancy's claim that Dwight only gave

her $35 per month, Dwight claims that his paycheck was being directly deposited into his and Nancy's joint savings account in Georgia. Meanwhile, he was living off of his expense account, because it covered all of his expenses.

¶17. In June, 1985, Nancy served Dwight with divorce papers while the two of them were together at a company convention in New Orleans. Shortly thereafter, the couple moved out of the marital home in Gainesville, and were separated from each other for the next three years. Since Dwight was still living in Virginia during the week, he asked Nancy to split the belongings. She gave him only the furniture which he had before they were married. He bought the cabin and refurbished it so that when he sold it, he got $50,000 more than he had paid for it.

¶18. Nancy contacted Dwight about giving her some money to build a house. He sent her the money for a down payment and closing costs. They had little contact after that until he went to Gainesville in the fall of 1987. While he was in town, a sheriff's deputy served him with divorce papers at his hotel room. There was no court date on the papers and he and Nancy had no further conversations about it.

¶19. In January, 1988, Nancy called Dwight in Virginia to discuss the prospect of reuniting because she was tired of being alone. They did reunite, in March of that year, leaving Sherri in Gainesville to live with a friend so that she could graduate high school with her class, while Nancy moved to Virginia and began working for an electrical contracting company.

¶20. After Nancy moved to Virginia, Dwight found that she was behind on the house payments, car payments for a new car that she had recently purchased, and payments on a new sofa. Dwight sold part of a coin collection which he had before the marriage to help her catch up on the bills. Nancy did not adapt very well to life in the cabin. Within two months of moving into the cabin, she wanted to move.

¶21. As a result, Dwight asked for and received a transfer to Hattiesburg, Mississippi. They sold the cabin, putting $17,000 of the proceeds of the sale down on a new home on Lakeside Drive in Hattiesburg. The remainder was placed in a joint savings account. They bought some new furniture and had some antique furniture refinished. Dwight's salary before bonuses was about $46,000 when they moved to Hattiesburg, so Nancy did not need to work. They were generally happy during that time.

¶22. Shortly thereafter, Sherri lost her job in Georgia, got pregnant, and moved in with them in Hattiesburg in early 1990. The baby was born in August, 1990. The expenses of the childbirth were carried by Sherri's boyfriend in Gainesville.

¶23. During the marriage, Nancy took money from the joint savings account and started up her own in-home business called Beauty Control. She opened up an account for the business at a local credit union. She put all income from the business into this account, but bought supplies with money from the joint savings account. Dwight claims that between the time that Nancy told him that she wanted a divorce in May, 1993, and the time that she filed in August, Nancy cleaned $8,000 from the joint account. He assumes that this is where she got the money to pay for the house that she bought.

¶24. In March, 1992, Dwight resigned his job at the *Hattiesburg American* under pressure from the

new publisher. Part of his payoff from Gannett was a six-month severance package which included pay and benefits. In order to help make ends meet until he found work, he paid off Nancy's and Sherri's cars. Thus the only bills were the house payment, food, and utilities. Nancy did not want to leave Hattiesburg, and he could not find work in the field that had employed him for the past twenty-six years.

¶25. In the fall of 1992, Dwight began negotiations with the owner of a small printing company to buy the business. Since the company was in a downhill slide, Dwight told Nancy that operating it would be just like starting a new business. He did not anticipate profits for up to two years. Nancy agreed to help him get the business off the ground.

¶26. He bought the company in February, 1993, using proceeds from the sale of Gannett stocks. For the first few months, business was terrible; he was paying out twice what he brought in. In May, Nancy began to talk about a divorce. She said that her sister was moving to Hattiesburg, and that she could move into the home, and Dwight could move out. Dwight was having no part of that, although he agreed to help move the sister to Hattiesburg.

¶27. In August, Nancy served Dwight with divorce papers. Shortly thereafter, Nancy's sister moved in with them. Nancy said that her sister had put some money down on a house in Hattiesburg, but that the house would have to be in Nancy's name as her sister had no credit. In order to prevent her sister from losing the deposit, Dwight was needed to sign the papers since they were still married. Dwight signed the papers. In the meantime, the sister moved out of the house. Nancy said that she had moved in with Michelle (who by this time had moved to Hattiesburg from California). But unbeknownst to Dwight, the sister had gotten an apartment, and the house being bought in Hattiesburg belonged to Nancy. The house was purchased with money from the now empty joint savings account.

¶28. Nancy said that she was moving, but not before Christmas. On December 17, 1993, Dwight again asked when she was moving. Nancy replied that she would not move until the heat was on in her new house. That afternoon, she called him at work to say that she had moved out and for him not to be mad about the mess she left. When asked why she had lied about moving, she said that she wanted to be able to take what she wanted without Dwight interfering. He discovered that once again, she had taken everything acquired during the marriage. In addition, she had taken a silver dinnerware set that he had bought in 1971; the good china set; all the pots and pans, including an old set in the attic; fifty-five of sixty-six pieces of lead crystal bought an auction a couple of years before the final separation; and the refrigerator.

## THE DIVORCE PROCEEDINGS

¶29. After several rounds of pleadings, complaints, and counter-complaints with answers thereto, the parties met in Forrest County Chancery Court on August 18,1994. Both parties stipulated that they were willing to forego oral testimony, complete with the opportunity for cross-examination and the opportunity to have the chancellor weight the credibility of each witness and instead have the chancellor decide the merits of their divorce based solely upon affidavits which were to be submitted shortly thereafter by each party and any witnesses either may have had.

¶30. The parties stipulated that the issues to be decided by the chancellor were as follows:

(1) Which party was entitled to the marital home located in Hattiesburg, Mississippi;

(2) Which party was entitled to be awarded the home located in Georgia;

(3) Whether or not Nancy was entitled to a share of the retirement and stock options, 401K plans and IRAs that Dwight has with his former employer, Gannett;

(4) Whether or not Dwight should be required to pay all bills of the marriage;

(5) Whether or not Dwight should be required to pay or make a contribution to Nancy's attorney's fees;

(6) Which party was to pay the mortgages on the homes in Hattiesburg and Georgia;

(7) Whether or not the Court should order a partition of the real property owned by the parties; and

(8)Whether or not Nancy had any interest in the Florida home owned by Dwight.

¶31. On December 1, 1994, the chancellor entered a Final Judgment and Order granting the Sandlins a divorce on the grounds of irreconcilable differences. Further the chancellor ordered the following as it concerned the property settlement:

(1) Nancy was awarded the marital Home in Hattiesburg and must pay the mortgage, taxes, and insurance on it without contribution from Dwight;

(2) Nancy was awarded the home in Georgia and must pay the mortgage, taxes, and insurance on it without contribution from Dwight;

(3) Nancy was granted thirty percent of the present fair market value of Dwight's Gannett Company, Inc. Retirement Plan and forty percent of the 375 shares of Gannett stock acquired during the marriage;

(4) Dwight was ordered to pay all the debts that the parties incurred before the separation, with the exception of the mortgage payments on the Hattiesburg home and the Florida home.

(5) Dwight was ordered to pay $2,000 toward Nancy's attorney's fees.

(6) The chancellor denied partition of the couple's property;

(7) The chancellor expressly found that Nancy had no interest in the Florida home owned by Dwight; and,

(8) The Court found that the division of property was fair and equitable to both Dwight and Nancy.

¶32. Dwight, strongly disagreeing with number (8), appealed.

### STANDARD OF REVIEW

¶33. Our scope of review in domestic relations matters is limited. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994); *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990). In other words, "on appeal this Court is required to respect the findings of fact by the chancellor supported by credible evidence and not manifestly wrong." *Ferguson* at 930, *quoting Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990).

## DISCUSSION OF LAW

### I.

**WHETHER THE CHANCELLOR MUST MAKE A DETERMINATION OF THE FAIR MARKET VALUE OF THE MARITAL ESTATE BEFORE DIVIDING IT, AND WHETHER THE RECORD CONTAINS ADEQUATE EVIDENCE FOR SUCH A DETERMINATION TO BE MADE.**

¶34. "Property division should be based upon a determination of fair market value of the assets, the these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case." *Ferguson* at 929. Dwight's initial claim is that the chancellor did not determine the fair market value before dividing the property. Specifically, Dwight claims that the chancellor did not value the houses or his retirement account before giving Nancy a portion of these. As a result, Dwight feels that the chancellor was not aware of what he was dividing. However, both Dwight and Nancy listed their assets and the value of those assets. Dwight himself valued the homes as follows: Florida home, $65,000; Georgia home, $55,000; and Mississippi home, $95,000. Nancy valued the following stocks at $12,000; Dwight's 401(k) plan at $11,000; Dwight's IRA at $5,000; and her own 403(b) retirement plan (which, incidentally, was not divided) at $4,800. Nancy listed the Gannett retirement plan as an asset, but did not value it. Information on the Gannett Retirement Plan is included in the record which estimates that the plan will pay Dwight $1, 119 per month beginning at age 65, but the present cash value for the plan is not listed. However, the plan is divisible by the use of a Qualified Domestic Relations Order which could subdivide the benefits. Assuming that neither of the two parties lied or was mistaken as to the value of the assets, the chancellor could have valued the property based upon their estimates. *Ferguson*, *supra*, does not say that expert testimony **is** essential; it says expert testimony **may be** essential. The determination of the value of the assets being divided is not so inordinately difficult that expert testimony was necessary in this case. Therefore, this Court cannot say that the chancellor abused his discretion in not using expert testimony to divide the property. Thus, this Court finds this issue to be without merit.

### II.

**WHETHER THE CHANCELLOR MADE THE REQUIRED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN THE DETERMINATION OF EQUITABLE DIVISION AND MADE AN EQUITABLE DIVISION OF PROPERTY BASED UPON THE EVIDENCE PRESENT IN THE RECORD.**

¶35. In *Ferguson v. Ferguson*, this Court promulgated guidelines to aid chancellors in the division of marital property. This Court stated:

> . . .this Court **directs the chancery courts to evaluate the division of marital assets by the following guidelines and to support their decisions with findings of fact and conclusions of law for purposes of appellate review** . . .Although this listing is not exclusive, this Court suggests the chancery courts consider the following guidelines, where applicable, when attempting to effect an equitable division of marital property:
>
> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
> a. Direct or indirect economic contribution acquisition of the property;
>
> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>
> c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the asset.
>
> 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise.
>
> 3. The market value and emotional value of the assets subject to distribution.
>
> 4. The value of the assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
>
> 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
>
> 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
>
> 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
>
> 8. Any other factor which in equity should be considered.

*Id.* at 928. (emphasis added).

¶36. The chancellor mentioned the guidelines, stating that he was following them and applying them to the facts of the case. But in his order granting the divorce and dividing the property he made no findings of fact or conclusions of law as is required by *Ferguson*. Therefore, this Court could not evaluate the basis that he used to determine the division of property. For instance, we could not determine why the Hattiesburg marital home was awarded to Nancy when she had moved out of it and into another home in the city. Further, the chancellor did not put into the record exactly how he figured out that Nancy was entitled to forty percent of 375 shares of Gannett stock. There was some

question as to the exact amount of stock that Dwight owned. Although Nancy estimated that Dwight owned 375 shares, the record shows three separate certificates showing 247 total shares. There also exists in the record a letter from Gannett documenting that it had issued Dwight $6,548.75 worth of stock at $42.25 per share for a total of 155 shares in late 1991. But given the fact that Dwight had purchased the print shop in part with funds from the sale of $12,000 worth of Gannett stock in 1993, it cannot be said with certainty that Dwight owned those 155 shares.

¶37. These are but two instances to show that the record would have been better served had the chancellor made findings of fact and conclusions of law on the record. He did not. As a result, this Court finds that the failure to make findings of fact and conclusions of law was manifest error requiring reversal and remand.

## III.

### WHETHER THE SUMMARY AFFIDAVIT PROCEDURE COMPORTS WITH DUE PROCESS.

¶38. Finally, Dwight complains that he was denied due process because the chancellor made his decision based upon two unrebutted, un-cross examined affidavits. Dwight claims that "to allow such a procedure in a divorce case in which the chancellor must make inherent judgments about the character and contributions of individuals in the marriage does not comport with notions of fair play and substantial justice inherent in a due process system."

¶ 39. Dwight admits that the right to cross examine and confront witnesses can be waived. But in essence he does not think that this is a fair process because it denies a full hearing on all the facts. Both parties waived their right to cross examine and confront witnesses against them in open court at the August 18, 1994 hearing. At that time, Dwight and Nancy both stipulated to the process. The chancellor stated that if one party wanted to rebut something in the other's affidavit, that party could do so in a counter affidavit. Dwight had the benefit of seeing Nancy's affidavit before filing his own, so he could rebut her assertions in his original affidavit. Nancy did not take advantage of the counter affidavit process.

¶ 40. Trial by affidavit is a process that is allowed in several states. *See* ***Overman v. Overman***, 102 Idaho 235, 629 P.2d 127 (1980); ***Eberly v. Eberly***, 489 A.2d 433 (Del.1985); ***Seiber v. Seiber***, 258 N.W.2d 754 (Minn. 1977), (but "if facts or affidavits render cross-examination essential, formal hearing must be held)." ***Saturnini v. Saturnini***, 260 Minn. 494, 497, 110 N.W.2d 480, 483(1961); ***Carvelho v. Carvelho***, 838 P.2d 259, 262 (Ak. 1992).

¶ 41. This Court however, has eschewed the use of affidavits as a substitute for a legitimate trial, except when used in the context of summary judgement under MRCP 56. ***Sullivan v. Trustmark National Bank***, 653 So. 2d 930, 932 (Miss. 1995); ***Brown v. Credit Center, Inc.,*** 444 So. 2d 358, 362 (Miss. 1983); ***Donald v. Reeves Transport Co.,*** 538 So. 2d 1191, 1195-96 (Miss. 1989). In the case at bar, because both parties made a "knowing and intelligent" waiver of their respective rights to cross examination, allowing the chancellor to rely upon their affidavits in reaching his decision, we find that this issue is without merit.

## <u>CONCLUSION</u>

¶42. We find that the issue of whether the fair market value of the items was established is without merit, in that the chancellor could make a determination of fair market value based upon the documents in evidence. We further find that the Appellant's due process rights were not violated because he specifically waived his right to confront witnesses and cross examine the testimony of his wife. However, we reverse and remand this case because it was manifest error to fail to make findings of fact and conclusions of law which could have formed a basis for appellate review to determine exactly how the chancellor subdivided the property.

¶43. **AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**