557 So.2d 511 (1990)
Leslie Karen NEWSOM
v.
Henry Eugene NEWSOM.
Nos. 07-CA-58966, 07-CA-59632.
Supreme Court of Mississippi.
February 14, 1990.
*512 Martin T. Smith, David R. Smith, Smith Smith Tate & Cruthird, Poplarville, Grady F. Tollison, Jr., Tollison & Alexander, S. Allan Alexander, Patterson Tollison & Alexander, Oxford, for appellant.
James R. Hayden, Hattiesburg, for appellee.
Robert R. Marshall, Erik M. Lowrey, Hattiesburg, for amicus curiae.
Before DAN M. LEE, P.J., and PITTMAN and BLASS, JJ.
BLASS, Justice, for the court:
Leslie Karen Newsom (Karen) and Henry Eugene Newsom (Eugene) were divorced on April 16, 1986. Karen was awarded custody of Kathryn, then two years and four months old, and Adam, then eight months old, subject to visitation by Eugene. On July 10, 1986, Karen filed a Petition to Modify the visitation, charging Eugene with physical abuse of the children. Erik Lowery was appointed guardian ad litem on May 18, 1987. There was an extended trial. The Chancellor found from the evidence that Eugene was not guilty of abuse, but Karen was and on August 3, 1987, awarded custody to Eugene. Karen appeals this order. She charges that the Chancellor was manifestly in error in both findings and that there was no evidence to support the Order changing custody.
Karen refused to obey the Order of August 3, 1987, and refused to deliver the children to Eugene and hid them instead. She was found in contempt and ordered jailed on August 21, 1987, after refusing to reveal the location of the children. It was not until after her original attorney, Garnett Harrison, withdrew, that Karen surrendered the children to the Court. Subsequently, by order of October 14, 1987, Karen's right to visit the children was severely restricted. On January 12, 1988, the court ruled on post trial motions. Karen appeals this ruling assigning three errors: (1) that the Chancellor erred in restricting Karen's visitation by his October 14, 1987 Order; (2) that he abused his discretion in considering the testimony of John Ireland; and (3) that the Chancellor erred in his holding of January 12, 1988, making permanent the restricted visitation.

I.
This record reveals the tragic failure of a marriage made more painful by public exposure. The children of this marriage have been used as a weapon of revenge; victimized by vicious and reputation destroying accusations; and subjected to repeated physical and psychological examinations over a period of many months, intimate *513 details of which were revealed to the press. In addition, Karen Newsom openly defied the authority of the law of the state in refusing to surrender the children in accordance with the order of the court.
These parents were divorced in April, 1986. In May, 1986, while Eugene and Karen were engaged in a sexual act Katie walked in and watched. Karen discussed the act with Katie in graphic detail, in terms the child understood, explaining that it was a manifestation of the couple's love for each other. Karen began making allegations of sexual abuse of Katie by Eugene the next month, in June, 1986. In July, Karen denied Eugene visitation. Karen took the child to a counseling psychologist, Catherine Meeks, Ph.D., on July 7 and again on July 14, 1986. At these meetings Katie was introduced to anatomically correct dolls by Dr. Meeks. She denied any physical abuse by her father. On July 18, 1986, Katie was examined by Dr. Woody Hiatt, of Jackson, MS., who found no medical evidence of sexual abuse, nor did he elicit from Katie any clear suggestion of sexual abuse.
After a week long visit with Eugene in July, Katie was again examined by Dr. Hiatt who again failed to find any evidence of sexual abuse. Both children visited Eugene for a week in August, and continued regular bi-weekly visits until November.
Throughout this time, Katie's visits to Dr. Meeks continued. At these sessions Dr. Meeks broached the subject of inappropriate touching. Katie was initially unresponsive and in December still denied any inappropriate touching.
On October 14, 1986, Karen and Eugene were again sexually intimate. Karen offered to drop the lawsuit and allegations of sexual abuse if he would agree to a reconciliation. Eugene refused, feeling that the damage to his reputation required a public vindication. After the two children returned from a week long visit with Eugene the following month, Karen had Katie examined by a pediatrician, Dr. McCrary. In relating a history, Karen indicated that Katie had vividly described a sexual encounter with the father. Although Dr. McCrary found no signs of molestation, he filled out a Welfare Department Form 440[1] based on the explicit history.
Eugene's last unsupervised visit with his children occurred during the last weekend of January, 1987. The children were again examined by Dr. McCrary on February 2, 1987. Katie was found to have swollen genitalia; Adam revealed no abnormalities indicative of abuse. After this medical examination, Katie was interviewed by Dr. Meeks and continued to deny any sexual encounter with Eugene.
Katie was brought to Dr. Meeks on two separate occasions in February, 1987, during which she was questioned extensively and explicitly regarding inappropriate touching. During one meeting she said her father had hurt her on her bottom. Near the end of February, Katie reportedly made sexually explicit statements to her baby-sitter. Katie visited with Dr. Meeks five times in March and April. Each meeting lasted one hour. Dr. Meeks testified that these sessions were diagnostic, not therapeutic.
In March, Katie was again examined by Dr. McCrary and diagnosed with encopresis (chronic constipation). In April, 1987, Dr. McCrary performed a culture test for Chlamydia and Gonorrhea on Katie, which was negative.
On June 22, 1987, both children visited Eugene at his parents' home. Eugene was never alone with the children. Immediately following this visit, Karen had Katie and Adam examined by McCrary. She reported that the visitation was unsupervised. Katie had a rash on her hands and legs. Adam was emotionally upset. On cross-examination, Dr. McCrary stated that there was no physical evidence to support an allegation of abuse.
Both children were examined again on July 22, 1987, by Dr. McCrary, who found no indicia of abuse.

*514 II.

WAS THE CHANCELLOR MANIFESTLY IN ERROR IN FINDING THAT EUGENE HAD NOT MOLESTED THE CHILDREN?
Appellant contends that the findings of fact made by the chancellor are manifestly wrong and against the overwhelming weight of the credible evidence. She contends that the testimony of Drs. Meeks, McCrary, and Hiatt which was that there was a substantial likelihood that acts of sexual abuse had been committed by Eugene, was uncontradicted and unimpeached.
Appellee contends that Katie's sexual knowledge may have been gained when she walked in on her parents engaged in sex in May 1986. He further points out that none of the physicians filed a report of abuse to either welfare or criminal authorities; nor did the doctors, with the exception of the court appointed physician, talk to Eugene.
The Guardian Ad Litem's position is that the only medical evidence of any potential abuse was the swollen clitoris of Katie, observed by Dr. McCrary on February 2, 1986. The only other evidence is double and triple hearsay attributed to Katie by her mother, baby-sitter, and counseling psychologist, Catherine Meeks.
On appeal the Supreme Court is required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong. Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985). In addition, where the Chancellor made no specific finding, the Court is required by prior decisions and sound institutional considerations to proceed on the assumption that the Chancellor resolved all such fact issues in favor of appellee. Id. citing Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss. 1985); Enlargement of Boundaries of Yazoo City v. City of Yazoo City, 452 So.2d 837, 842 (Miss. 1984); Harris v. Bailey Avenue Park, 202 Miss. 776, 791, 32 So.2d 689, 694 (1947).

Dr. McCrary's Findings
When the children were first brought to Dr. McCrary's office for examination on December 3, 1986, Karen related a history of possible sexual abuse. This history consisted of stories of inappropriate touching by the father; talk of erect penises and references to pelvic thrusting by Katie; and the fact that Karen found Katie putting an object in Adam's rectum. Dr. McCrary wrote, "Both exams of children show no obvious signs of sexual abuse, however the explicit history of the child definitely is indicative of sexual molestation. These children should not go to their father's house until this case is investigated and ruled on."
When the children were examined on February 2, 1987, Dr. McCrary found physical evidence consistent with some type of sexual manipulation, not self induced. When Dr. McCrary examined Adam on February 4, nothing abnormal was found despite the mother's allegations of abuse.
Dr. McCrary examined the children on June 22, 1987, after they returned from visiting Eugene. Katie had a rash, and resisted the vaginal examination. Adam displayed no physical indicia of abuse.
In Dr. McCrary's opinion, the only physical evidence of abuse was the swelling evident on February 2, 1987.
On cross-examination, Dr. McCrary stated, "In my heart, I can't say there is any physical evidence to support they were abused." On further questioning Dr. McCrary stated that the historical account given by Karen Newsom suggested abuse, that Katie never discussed any possible abuse; and the entire history was taken from Karen.
The evidence and Dr. McCrary's own testimony suggest that Dr. McCrary's opinion that Eugene Newsom had abused Katie and Adam was based solely on the history given by Karen Newsom.

Dr. Catherine Meeks
Dr. Meeks evaluated Katie from July 7, 1986, until June 22, 1987. Dr. Meeks testified to, what were in her mind, six separate reports of abuse by Katie. The Guardian Ad Litem points out that from July 14, *515 1986, until February 13, 1987, Katie continually denied any sexual abuse.
Having carefully examined the testimony of Dr. Meeks, we cannot say that the Chancellor was manifestly wrong in finding that her assertions that Katie was abused were no more than expressions of suspicion based on her personal conclusions and not supported by any factual basis. According to Dr. Meeks, Katie possessed a knowledge of sexual acts beyond that expected of a child her age. Dr. Meeks' descriptions of her sessions with Katie indicate that Katie responded affirmatively to leading and suggestive questions. There are passages which Dr. Meeks saw as a report of sexual abuse, where the events could be characterized as a description of the incident in which Katie walked in on her parents.

Dr. Wood Hiatt, M.D.
Dr. Hiatt was appointed by the court to examine the Newsom children. His interim report, filed February 26, 1987, stated that as a result of preliminary investigation of Karen, Katie, and Eugene he had concluded that there was not sufficient evidence to support an accusation of child abuse. It was only after he was provided with reports of Dr. McCrary's office and Dr. Meeks that he modified his opinion to reflect an impression that Eugene had abused Katie.
This change in diagnosis demonstrates the basis on which the accusations of abuse were built. Karen Newsom took the children to a physician and gave a history indicative of abuse. The physician in turn, observed physical evidence which may or may not have indicated abuse. In light of the history, he concluded that the child had been abused. The child was then taken to a psychologist who evaluated the child's behavior in light of the reported history of abuse. There appears to have been a "snowball effect" at work among the doctors. Before he consulted with Drs. McCrary and Meeks, Dr. Hiatt felt there was no abuse. After consultation, he evaluated the evidence in a different light, finding abuse.
We cannot say that the Chancellor was wrong in evaluating Dr. Hiatt's opinion by looking beyond it to the base on which the opinion was formed.

Dr. John Galloway, Ph.D.
Dr. Galloway examined the children and Karen and Eugene, at the order of the court, without the benefit of any prior history. His report indicated that Katie and Adam were normal, outgoing children, and stated further that if anything had happened to either of them it wasn't readily apparent. Eugene was described as a very outgoing, thirty-seven year old who was very distraught over the accusations made by his wife. Dr. Galloway found no indicia of the characteristics of a child molester. Karen was described as talented and outspoken, but Dr. Galloway questioned the validity of her accusations.
Consistent with this court's standard of review, we find that the Chancellor was not manifestly wrong in finding that there was insufficient evidence of sexual abuse of Katie and Adam. On conflicting evidence, the Chancellor made a finding of fact which has ample support in the record.
It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury. While he may not arbitrarily fail to consider such testimony, he is not bound to accept it. In the ultimate analysis, the trier of fact is the final arbiter as between experts whose opinions may differ as to precise causes ... (citations omitted).
Pittman v. Gilmore, 556 F.2d 1259 (5th Cir.1977).

III.

DID THE CHANCELLOR ERR IN CHANGING CUSTODY OF THE MINOR CHILDREN?
There are two prerequisites to a modification of child custody. First, the movant must prove by a preponderance of the evidence that since the entry of the judgment or decree sought to be modified there has been a material change in circumstances which adversely affects the welfare of the child, Second, if such adverse change has been shown, the moving party *516 must show by preponderance of the evidence that the best interest of the child requires the change in custody. Pace v. Owens, 511 So.2d 489 (Miss. 1987); Duran v. Weaver, 495 So.2d 1355 (Miss. 1986); Smith v. Todd, 464 So.2d 1155 (Miss. 1985).
Applying the first prerequisite, the chancellor found that Katie had been "... subjected to the subtleties of psychological interrogation and cross-examination, much of it revealed to have involved inferences and suggestions to the child albeit veiled and sublime (sic)." He also determined that a material change in circumstances had adversely impacted the welfare and best interests of the children. These findings of fact are supported by evidence in the record.
The second prerequisite to a modification of child custody is a showing that the best interest of the child requires the change in custody. The factors to be weighed in reaching an initial decision concerning child custody were stated in Albright v. Albright, 437 So.2d 1003 (Miss. 1983):
We reaffirm the rule that the polestar consideration in child custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship. 437 So.2d at 1005.
A chancellor is charged with the responsibility to determine whether a material change in circumstances has adversely affected the children, and warrants a change in custody viewing the totality of the circumstances. Bowden v. Fayard, 355 So.2d 662, 700 (Miss. 1978).
The record indicates that Karen had moved and changed employment several times during the year after the divorce. Day care arrangements were similarly changed. The chancellor found that Karen had subjected the children to numerous unwarranted physical and psychological examinations, not for treatment, but for investigation and interrogation. He also found that Katie had exhibited distress and disturbance when being returned to Karen at the end of a visitation period with Eugene. In contrast, Eugene held a stable position and maintained a stable home. His parents provided alternative care. See: Bowden v. Fayard, 355 So.2d 662 (Miss. 1978); Kavanaugh v. Carraway, 435 So.2d 697 (Miss. 1983).
The record supports the Chancellor's findings and conclusions. We find that he did not err in his determination that a material change in circumstance adverse to the welfare and best interests of the children warranted a change in custody.

IV.

DID THE COURT ERR IN MODIFYING THE AUGUST 3, 1987, JUDGMENT OF MODIFICATION?
The August 3rd judgment awarded custody of the children to Eugene, subject to reasonable visitation by Karen. After Karen refused to deliver the children, she was jailed for contempt of court, from late August until October 1987. On delivering the children and purging herself of contempt, the Chancellor's order of October 12, 1987, restricted Karen's visitation to allow visitation not more than once per week, for no more than one and one-half hours, in Eugene's home. These conditions of visitation were made permanent in the January 12, 1988, Memorandum Opinion on Post Trial Motions. Appellant contends that the chancellor erred in modifying her visitation rights without a motion by Eugene to modify *517 the August 3rd judgment, citing Cox v. Moulds, 490 So.2d 866 (Miss. 1986).
In Cox, the issue before the court involved the authority of the Chancery Court to place restrictions upon a non-custodial parent's exercise of visitation rights. The chancellor restricted visitation based solely on the fact that the daughter aged 13 would not have her own room on the nights she visited her father. In reversing the chancellor, this court found "... no substantial evidence supporting the proposition that such overnight visitation would present any appreciable danger of hazard cognizable in our law." 490 So.2d at 871. The court stated in a footnote that this is not to suggest that there will never be such circumstances justifying the restriction of visitation rights. Id. This footnote suggests, and we hold that the chancery court has the power to restrict visitation in circumstances which present an appreciable danger of hazard cognizable in our law.
In this case Karen Newsom had proven that she was capable of secreting the children in defiance of the court ordered change of custody. This could certainly be considered a cognizable danger.
The disobedience to the Decree of August 3, 1987, by Karen Newsom is a material change in circumstances which justifies the chancellor's modification of her visitation. The safety and welfare of the minor children compelled the chancellor to act in their best interest, protecting them from abduction by Karen.
By deposition, Karen Newsom admitted that after she learned of the order changing custody she was advised by her attorney to hide the children. While in hiding the children were taken by Karen to New Orleans to be examined by Dr. Cowan. Garnett Harrison, then her attorney, prepared a press release which included reports and statements of Drs. Whiting, McCrary, Meeks and Haygood. These materials, released on August 14, contain detailed and explicit references to the alleged abuse. By no stretch of the imagination could the publication of these reports be said to benefit the children. On August 20, Karen told the court that she was the only person who knew the whereabouts of the children, when in reality, Harrison and her staff and several others knew, including Dr. Whiting and Dr. Meeks. Approximately one week later, Karen's mother took control of the children because she was concerned that the situation had gotten out of Karen's control.
The chancellor is charged with the responsibility to protect the children and determine what visitation is in their best interest; great deference is given to the chancellor's decision on these matters. Spain v. Holland, 483 So.2d 318 (Miss. 1986); Pellegrin v. Pellegrin, 478 So.2d 306 (Miss. 1985); Albright v. Albright, 437 So.2d 1003 (Miss. 1983); Carr v. Carr, 480 So.2d 1120 (Miss. 1985); Tucker v. Tucker, 453 So.2d 1294 (Miss. 1984); Baneck v. Baneck, 455 So.2d 766 (Miss. 1984); Crowson v. Moseley, 480 So.2d 1150 (Miss. 1985); Sparkman v. Sparkman, 441 So.2d 1361 (Miss. 1983).
Karen's apparent instability and previous abduction of the children in defiance of the court order was ample justification for the restricted visitation. Accordingly, we find that the Chancellor did not err in severely restricting Karen's visitation. Indeed, he would have been remiss had he not done so.

V.

DID THE CHANCELLOR ABUSE HIS DISCRETION IN FINDING THAT JOHN IRELAND'S TESTIMONY WAS CREDIBLE?
The Guardian Ad Litem moved to reopen the case on September 14, 1987, for review of newly discovered evidence. The testimony of John Ireland was heard by the court. Ireland's testimony was that he had overheard two women, Garnett Harrison and Karen Newsom, plotting to falsely accuse a father of abuse of her daughter. The Chancellor, in his "Memorandum Opinion On Post Trial Motions", opened the record, evaluated Ireland's testimony, and found it credible for the purpose of ruling on the *518 Guardian Ad Litem's request that Karen's unsupervised visitation be restricted.
The chancellor sitting as a trier of fact can be reversed only on a finding of manifest error. Rives v. Peterson, 493 So.2d 316, 317 (Miss. 1986). We find no manifest error in this instance. Credible or not, we can see no impact on the chancellor's restriction of Karen's visitation. As stated above, her behavior in abducting the children was sufficient cause for the supervised visitation.

VI.

DID THE CHANCELLOR ERR IN HIS JANUARY 12, 1988 DECISION?
This decision addressed five post trial motions. (1) The Motion by the Guardian Ad Litem to re-open the record under MRCP 60(b), for newly discovered evidence, the testimony of Ireland, discussed above. (2) The Motion of Guardian Ad Litem for the allowance of additional fees for services rendered post trial. (3) The Motion of Guardian Ad Litem to freeze funds in an account entitled "Kathryn Newsom, minor, or Adam Newsom, minor". (4) The Motion by Karen Newsom to reopen the record under MRCP 60(b) for newly discovered evidence, the deposition of Dr. George Cowan, M.D., the physician who examined the children in New Orleans after the August 3rd ruling. (5) A Motion by Karen Newsom to modify the Court's order regarding her restricted visitation as ordered on October 13.
The Chancellor's ruling on Ireland's testimony was discussed previously. The rulings on the motions for allowance for additional fees and to freeze funds are apparently uncontested.
The Chancellor reopened the record, as requested in Karen's 60(b) motion, for the purpose of considering Dr. Cowan's deposition. We set out his finding below:
2. The Court entertains serious doubt that this "newly discovered evidence" is such that it truly falls within the purview of Rule 59 and 60, M.R.C.P., particularly "newly discovered evidence which by due diligence could not have been discovered", etc. Nevertheless, out of an abundance of precaution the Court has determined to receive into evidence this `noncompliance, ex parte, so-called expert' testimony.
3. The examination done by Dr. Cowan was on August 12, 1987. The last time that defendant had been alone with his children, or either of them, was the visitation at the end of January 1987. The only other visitation was for a part of an afternoon, in late June, 1987, and the record is conclusively clear that Defendant was at no time alone with either of the children during that short visitation. Therefore, it is beyond question that at the time of Dr. Cowan's examination of the children on August 12, 1987, it had been more than six (6) months since Defendant Gene Newsom could have had any opportunity to do anything to or with his children, or either of them.
4. Only in light of that set forth in the next above preceding paragraph must Dr. Cowan's following testimony be evaluated:
Katy's vulva swollen and erythematous, red and injected and inflamed  page 10, Cowan deposition
periurethral area very red and very inflamed  page 13, Cowan deposition, and page 3 of Exhibit 5, Cowan deposition
and therefore the Court is caused to say: Quare? If those observations are manifestations of some type of molestation, by what stretch of the imagination could Defendant, who had not been alone with the children for more than six months, be declared to be the perpetrator?
5. Dr. Cowan's testimony adds nothing toward Plaintiff's burden to show (1) by clear and convincing evidence that sexual molestation has taken place, and (2) that, assuming `arguendo' or having proven such, the second and equally important fact of WHO DID IT:
.....
6. Dr. Cowan deals with the highly pertinent subject of Katy's statements relating to "good and bad touching" (see, Cowan deposition, page of Exhibit 5), *519 and with candor speaks of Katy's "... limited grasp of those concepts", and what is developed by Dr. Cowan on that subject does not serve to bolster Plaintiff's cause as asserted through Dr. Meeks, but quite clearly contradicts Dr. Meeks theory and presentation  a fact which can only serve to diminish the effect of Dr. Meeks testimony.
7. Dr. Cowan's references to Katy's "limited grasp of those concepts" bring into sharp focus the great amount of the testimony of Dr. Meeks at the trial in chief, i.e., Dr. Meeks repeated hearsay testimony of statements made by Katy to her  hearsay which was admitted into evidence by the Court over the objection of Defendant. However, the Court, in admitting that hearsay was not unmindful of the source  a child of the age of two and one-half to three and one-half years.
.....
8. Dr. Cowan's testimony lends absolutely nothing to the already failed case of Plaintiff ...
The restricted visitation was based on the chancellor's, the Guardian's, and the father's fear that Karen would escape with the children given the opportunity. The Chancellor took judicial notice of activist groups who encouraged disobedience to court orders; we can see no way he could have avoided such notice as these persons have used press coverage in other cases and in this case as a tactic in attempting to force decisions favorable to their views.
The record shows that the allegations of sexual abuse commenced about two months after the divorce, and one month after the post-divorce sexual episode Katie observed. The charges continued over a long period. Yet, while the charges were being continuously made, Karen offered to drop them all if Eugene would remarry her. On at least two occasions she engaged in sexual relations with him. In November, 1987, she requested that he keep the children for a month. The Chancellor cannot be said to be manifestly in error for not endorsing the "history" of sexual abuse she gave to the physicians. The last straw, or the final nail, depending on one's metaphor, was the last medical examination, at least six months after the father's last possible opportunity to touch the children. The same symptoms appeared. It appears that there was no sexual abuse. If there was the Chancellor was clearly not manifestly wrong in saying it was not the father who did it.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, ANDERSON and PITTMAN, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] Miss. Code Ann. § 43-21-353 (1989 Supp.) requires that a physician, or any other person, having reasonable cause to suspect child abuse, report that suspicion to the Department of Public Welfare. The record is silent as to the filing of this report.