MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Summerall Electric Company, Inc., Don South Plumbing, Inc., and South and Son Construction Company, Inc., (collectively, the subcontractors) brought suit against the Church of God at Southaven (the Church), alleging that the Church, as the property owner, was liable for costs owed to the subcontractors by the general contractor, National Church Services, Inc. (NCS), which was not a party to the suit.
 
 [1]
 
 The subcontractors alleged that they had not been paid for their work in the construction of a sanctuary building.
 

 ¶ 2. The Church executed a “Construction Agreement” with NCS on September 24, 2005, for the construction of the sanctuary building. The contract price was stated as $1.1 million, plus the cost of the surety bond. NCS engaged the services of Rick Nealy, a member of the Church, as its construction superintendent for the project.
 
 [2]
 
 At the time, NCS did not hold a Mississippi contractors’ license; it claimed to be seeking one through a reciprocacy agreement with South Carolina.
 
 [3]
 
 The City of Southaven nonetheless allowed NCS to proceed with the construction.
 

 ¶ 3. Construction began in March 2006, several months later than provided for in the construction agreement. For the work, NCS employed various subcontractors; the subcontractors in the instant action contracted with NCS in February and March 2006. Nealy was NCS’s only employee permanently located in Southaven.
 

 
 *1092
 
 ¶ 4. As the construction progressed, payments from NCS to Nealy and its subcontractors began arriving late, and they had ceased by November 2006, when the subcontractors filed construction liens against the Church’s property. By this point, construction on the sanctuary building had stopped. The Church had paid NCS the balance due under the contract, but approximately $300,000 of work would be required to complete the sanctuary building. The three subcontractors alleged that they were owed about $110,000 among them.
 

 ¶ 5. The chancellor found that the subcontractors could not recover from the Church because they had failed to give stop payment notices before the Church made its final payment to NCS, the general contractor. The chancellor also found that the subcontractors could not recover against the Church on an agency theory because no principal-agent relationship existed between the Church and NCS. On appeal, the subcontractors challenge both findings, arguing that the chancellor erred because NCS was not a licensed contractor in the State of Mississippi. Finding no error, we affirm.
 

 STANDARD OF REVIEW
 

 ¶ 6. In reviewing the judgment of a chancery court, an appellate court “will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, applied an erroneous legal standard, was manifestly wrong, or was clearly erroneous.”
 
 Hamilton v. Hopkins,
 
 834 So.2d 695, 699(¶ 12) (Miss.2003) (citations omitted). Additionally, where the chancellor has made no specific findings, we will proceed on the assumption that he resolved all such fact issues in favor of the appellee.
 
 Newsom v. Newsom,
 
 557 So.2d 511, 514 (Miss.1990). A chancellor’s interpretation and application of the law, however, is reviewed de novo.
 
 Tucker v. Prisock,
 
 791 So.2d 190, 192(¶ 10) (Miss.2001).
 

 DISCUSSION
 

 1. Stop Notices
 

 ¶7. The chancellor found that because the subcontractors failed to timely file stop notices, they were simple creditors of the general contractor and were barred from recovery against the owners.
 

 ¶ 8. We have previously held:
 

 At common law, subcontractors are common creditors of the contractor for whom they agree to provide materials or services.
 
 Jones Supply Co. v. Ishee,
 
 249 Miss. 515, 527, 163 So.2d 470, 475 (1964). No privity exists between a subcontractor and an owner.
 
 Corrugated Indus., Inc. v. Chattanooga Glass Co.,
 
 317 So.2d 43, 47 (Miss.1975). But Mississippi Code Annotated section 85-7-181 (Rev. 1999) prescribes a remedy against the owner for a subcontractor “who may have furnished materials used in the erection, construction, alteration, or repair of any house” and who is not paid by the contractor. To exercise the remedy, the unpaid subcontractor must serve written notice of the debt upon the property owner, at which point “the amount that may be due upon the date of the service of such notice by such owner to the contractor or master workman, shall be bound in the hands of such owner for the payment in full, or if insufficient then pro rata, of all sums due such person....” Miss.Code Ann. § 85-7-181 (Rev.1999). In other words, when the unpaid subcontractor gives written notice (commonly termed a “stop notice”) to the owner, the subcontractor becomes entitled to payment from the owner up to the amount in which the owner is indebted to the general con
 
 *1093
 
 tractor as of the date the notice is served.
 
 Id.
 

 The service of the stop notice invokes the subcontractor’s statutory remedy against the owner.
 
 Id.
 
 Absent such notice, an owner has no obligation to a subcontractor who has provided materials or services pursuant to an agreement with a contractor.
 
 Corrugated Indus. Inc.,
 
 317 So.2d at 47. And, if a subcontractor serves a stop notice after the owner has paid the contractor the full amount due under the contract, the owner is not liable to the subcontractor.
 
 Id.;
 
 Miss.Code Ann. § 85-7-181.
 

 Timms v. Pearson,
 
 876 So.2d 1083, 1086 (¶¶ 8-9) (Miss.Ct.App.2004).
 

 ¶ 9. It is uncontroverted that none of the subcontractors filed stop notices before the owner, the Church, had paid its obligations to NCS, the general contractor.
 

 ¶ 10. On appeal, the subcontractors present several arguments as to why the owners should be liable notwithstanding the subcontractors’ failure to timely file stop notices. The subcontractors present each argument as a separate issue, but because all relate to the single overarching and dispositive issue of whether the chancellor erred in finding that the subcontractors were barred from recovering from the Church, we shall address them together.
 

 ¶ 11. First, the subcontractors argue that the chancellor erred in failing to consider Mississippi Code Annotated section 31-3-15 (Rev.2008), which provides:
 

 No contract for public or private projects shall be issued or awarded to any contractor who did not have a current certificate of responsibility issued by said board at the time of the submission of the bid, or a similar certificate issued by a similar board of another state which recognizes certificates issued by said board. Any contract issued or awarded in violation of this section shall be null and void.
 

 This provision applies to private construction contracts of one hundred thousand dollars or more. Miss.Code Ann. § 31-3-1 (Rev.2008).
 

 ¶ 12. The subcontractors fail to explain on appeal, however, why this was reversible error or what result section 31-3-15 requires. Nor is reversible error intuitive, as the subcontractor’s remedy under section 85-7-181 is limited by its own terms to “the amount that may be due upon the date of the service of [the stop] notice by such owner to the contractor.” If anything, had the chancellor found the contract between the Church and NCS null and void, there would be nothing owed to NCS by the Church, and the subcontractors could have no remedy against the Church under section 85-7-181.
 

 ¶ 13. The subcontractors also argue that
 
 Engle Acoustic & Tile, Inc. v. Grenfell,
 
 223 So.2d 613, 618 (Miss.1969), frames the issue as whether the owners or the subcontractors were in the better position to prevent the subcontractors’ loss.
 
 [4]
 
 This, however, was not the holding in
 
 Engle;
 
 there, the supreme court rejected the subcontractors’ argument that the owners’ superior trust in the general contractor entitled them to relief, noting that both parties’ trust in the general contractor was misplaced.
 
 Id.
 
 Instead, the court concluded that “[s]o long as advance payments to the prime contractor extinguished debt and were paid prior to the receipt of statutory stop payment notices, liability was precluded on the part of the owners.”
 
 Amerihost Dev., Inc. v. Bromanco, Inc.,
 
 786 So.2d 362, 367(¶ 20)
 
 *1094
 
 (Miss.2001) (restating the holding of
 
 En-gle).
 

 ¶ 14. Finally, the subcontractors argue that this result is simply unfair to them and that under our law even the most diligent subcontractors may be denied a remedy against the owners. The supreme court, however, has addressed and rejected this argument on numerous occasions. In
 
 Amerihost,
 
 the Court stated:
 

 [W]e must acknowledge that this is a very difficult decision to make, but no other result can be reached under a fair reading of the statute. We think it significant this statute has apparently worked well under our interpretation since the present version was adopted in 1918. That is not to say that the Legislature should not revisit this statute to bring the language up to date and review the protections offered in light of the use and custom in today’s construction industry.
 

 Id.
 
 at 365(¶ 13). Similarly, the supreme court in
 
 Engle
 
 noted that “[i]t is regrettably true that either the [subcontractors] will lose their labor and materials in the amounts stated or that the [ojwners will be forced to make a double payment.”
 
 Engle,
 
 223 So.2d at 618.
 

 ¶ 15. In summary, we find none of the arguments advanced by the subcontractors persuasive. Accordingly, we find that this issue is without merit.
 

 2. Agency
 

 ¶ 16. In the alternative, the subcontractors argue that the chancellor erred in finding that no agency relationship existed between the Church and NCS. If NCS were acting as an agent of the Church when it employed the subcontractors, the Church may be bound irrespective of whether the subcontractors failed to timely file stop notices.
 
 Aladdin Const. Co., Inc. v. John Hancock Life Ins. Co.,
 
 914 So.2d 169, 174(¶ 7) (Miss.2005). Alternatively, the Church may be bound if it created the “apparent authority” of NCS to act as its agent and to bind the Church in its dealings with the subcontractors.
 
 Bailey v. Worton,
 
 752 So.2d 470, 475(¶ 11) (Miss.Ct.App.1999).
 

 ¶ 17. Finding no agency relationship, the chancellor concluded that NCS was an independent contractor tasked with constructing a building and that the subcontractors could not hold the Church to NCS’s debts under an agency theory. At issue, therefore, is whether the chancellor’s finding that NCS was not acting as an agent of the Church is supported by substantial evidence.
 

 A. Actual or Implied Authority
 

 ¶ 18. We have stated that “[t]he most characteristic feature of an agent’s employment is that he is employed primarily to bring about business relations between his principal and third persons....”
 
 Bailey, 752
 
 So.2d at 474(¶ 8) (citing
 
 First Jackson Sec. Corp. v. B.F. Goodrich Co.,
 
 253 Miss. 519, 532-33, 176 So.2d 272, 278 (1965)). “An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by his authority. He is a substitute, a deputy, appointed by the principal, with power to do the things which the principal may or can do.”
 
 Id.
 
 (citing 2 C.J.S.
 
 Agency
 
 § lc (1936)).
 

 ¶ 19. The supreme court has stated that “[w]ith respect to general principles of agency, ‘the line between an agent and an independent contractor is not really a line but a “twilight zone,” with the answer inevitably revolving around the idea of control.’”
 
 Aladdin Const. Co., Inc.,
 
 914 So.2d at 175(¶ 10) (quoting
 
 Right v. Sheppard Bldg. Supply, Inc.,
 
 537 So.2d 1355,
 
 *1095
 
 1359 (Miss.1989)). The court has also stated that the key is determining whether “the agent acts on the principal’s behalf and is subject to the principal’s control.”
 
 Id.
 
 (citing Restatement (Third) of Agency § 1.01 (Tentative Draft No. 2, 2001)).
 

 ¶ 20. Although the subcontractors allege that the Church gave NCS actual authority to act as its agent in constructing the sanctuary building, their argument on this sub-issue is not well developed on appeal. They appear to rely on two factual bases.
 

 ¶ 21. First, the subcontractors assert that the Church entrusted NCS with the authority to contract on its behalf. This, however, is supported only by citation to vague admissions in the record that the Church entrusted NCS with the authority to do what was necessary to construct the building. On the other hand, the Church cites to the instruments executed between it and NCS that define their relationship as one between owner and contractor. The contract did not provide NCS with the express authority to employ subcontractors on the Church’s behalf. Instead, NCS was tasked to “fully execute” the construction of the building. The contract did not specify how; that is, it appeared to contemplate that NCS would employ subcontractors, but NCS would do so on its own behalf.
 
 [5]
 
 Likewise, the subcontractors were employed through contracts with only NCS; these instruments referred to each of the subcontractors as “subcontractor,” while NCS was called “contractor.”
 

 ¶ 22. Second, the subcontractors cite to instances where the Church was alleged to have exercised authority over the subcontractors. Particularly, Blaire Carlson, an employee of subcontractor Summerall Electric, testified that the Church directed changes to the original plans for the building. He also alleged that Pastor Massey and an associate pastor selected light fixtures and directed him to install them in the building. However, this testimony fell short of establishing any direct control by the Church. Carlson’s testimony was unclear as to whether the Church or NCS directed the changes, and he acknowledged that he was also accompanied by Nealy, NCS’s superintendent, when selecting the light fixtures. Additionally, Carlson was unequivocal in testifying that he understood that Summerall Electric was employed by NCS, rather than the Church; and his testimony suggesting that the Church exercised control over the subcontractors was contradicted by the testimony of numerous witnesses offered by both sides, including employees of other subcontractors.
 

 ¶ 23. The subcontractors also cite a letter sent by Pastor Massey to the Southa-ven Building Department that stated that the Church had released NCS and enumerated subcontractors from the construction project. However, Sydney Elliot, a building official for the City of Southaven, testified that the city required such letters from owners when they release general contractors. The letter, therefore, was not inconsistent with an owner-general contractor relationship.
 

 ¶ 24. In reviewing the record, we cannot say that the chancellor’s findings on this issue are clearly erroneous.
 

 B. Apparent Authority
 

 ¶ 25. The subcontractors also argue that the chancellor erred in not finding
 
 *1096
 
 that NCS had the apparent authority to bind the Church or act on its behalf.
 

 ¶26. “Apparent authority exists when a reasonably prudent person, having knowledge of the nature and the usages of the business involved, would be justified in supposing, based on the character of the duties entrusted to the agent, that the agent has the power he is assumed to have.”
 
 Bailey,
 
 752 So.2d at 475(¶ 11) (quoting
 
 Eaton v. Porter,
 
 645 So.2d 1323, 1325 (Miss.1994)).
 

 ¶ 27. “There are three essential elements to apparent authority: (1) acts or conduct of the principal indicating the agent’s authority; (2) reliance thereon by a third person, and (3) a change of position by the third person to his detriment.”
 
 Id.
 
 at (¶ 12). Each of these elements must be present, and the existence of apparent authority is a question of fact.
 
 Id.
 

 ¶ 28. Although they cite
 
 Bailey
 
 and its holding, the subcontractors simply fail to offer an argument sufficient to allow this Court to reverse a chancellor’s findings of fact on this sub-issue. While the subcontractors do cite some acts of the Church indicating the apparent authority of NCS to bind the Church, they fail to offer any evidence or argument concerning reliance by the subcontractors; in fact, none of the witnesses called by the subcontractors testified as to any belief that he or she was employed by the Church or on its behalf. This issue is without merit.
 

 ¶ 29. THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . NCS was named as a defendant by the subcontractors and by the Church in a cross-claim, but it could not be served with process. The Church did, however, receive a default judgment against Chip Green, the president of NCS.
 

 [2]
 

 . Nealy was a member of the Church’s building committee, but he resigned from that committee and other Church committees when he accepted the position with NCS. Testimony indicated that the various committees were advisory in nature and that all decisions were made by the Church’s pastor, Larry Massey.
 

 [3]
 

 .NCS's application was ultimately denied on the grounds that its South Carolina license was itself reciprocal.
 

 [4]
 

 . The subcontractors in
 
 Engle
 
 cited
 
 Railway Express Agency v. Bank of Philadelphia,
 
 168 Miss. 279, 150 So. 525 (1933), for this proposition.
 

 [5]
 

 . The contract provided that the Church could terminate the agreement if NCS “fails to supply enough properly skilled workers or proper materials,” or if NCS "fails to make payments to subcontractors for materials or labor in accord with the respective agreements
 
 between NCS and dm subcontractors.”
 
 (Emphasis added).