# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-CA-01248-SCT

*SAMUEL EVANS AND SANDRA EVANS*

*v.*

*MC&J INVESTMENTS, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2022 |
| TRIAL JUDGE: | HON. RODNEY PURVIS FAVER |
| TRIAL COURT ATTORNEYS: | JAY HOWARD HURDLE |
| | BENNIE L. JONES, JR. |
| | JOSEPH N. STUDDARD |
| | H. SCOTT ROSS |
| | STEVIE FARRAR RUSHING |
| | CHRISTINA M. SEANOR |
| | MARK A. CLIETT |
| | CHARLES FRANK FAIR BARBOUR |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | BENNIE L. JONES, JR. |
| ATTORNEY FOR APPELLEE: | MARK A. CLIETT |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 01/25/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE KITCHENS, P.J., COLEMAN AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     Samuel Evans and Sandra Evans appeal the trial court's refusal to set aside a foreclosure sale. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On December 19, 2003, Samuel and his wife Sandra executed a deed of trust securing

repayment of $40,800 for real property[1] located in Clay County.  The deed of trust granted a security interest in the property to the original lender, United Financial Mortgage Corporation, and was later assigned to U.S. Bank.

¶3.     Samuel and Sandra defaulted on their payments, and foreclosure proceedings were initiated.  Samuel and Sandra were advised that the foreclosure sale was scheduled for January 4, 2017.

¶4.     Samuel and Sandra contacted and entered into discussions with Bank of America to bring their payment obligations current in order to avoid foreclosure.  On December 22, 2016, Bank of America sent Samuel and Sandra a document entitled "Reinstatement Calculation" in which Bank of America represented the reinstatement amount necessary to reinstate the debt secured by the deed of trust.  The reinstatement calculation instructed Samuel and Sandra to send certified funds or money order to Bank of America in the amount of $9,511.13.  The reinstatement calculation noted that the reinstatement amount was "good through" January 3, 2017.

¶5.     According to Samuel, a Bank of America employee advised him that as long as Bank of America received the reinstatement amount before the foreclosure sale, the sale would not occur.  Samuel sent the reinstatement payment by FedEx on January 3 for an early delivery on January 4, before the scheduled foreclosure sale.  Samuel and Sandra assumed that they had brought their debt current and that the foreclosure sale would not go forward.  They later learned, however, that despite representations by Bank of America, the foreclosure sale had

---

[1] The real property consists of three acres of land and a house on that land.

occurred. Neither Samuel nor Sandra attended the foreclosure sale.

¶6.    The property at issue was purchased at the foreclosure sale by MC&J Investments, LLC, for $15,834.83. Julious McClinton, a real estate investor who buys properties in foreclosure, is the managing member of MC&J Investments. After the foreclosure sale, a substituted trustee's deed was issued to MC&J. The deed was later recorded on January 23, 2017, in the land records of Clay County.

¶7.    On February 23, 2018, Samuel and Sandra filed a complaint in Clay County Chancery Court against U.S. Bank, Bank of America, Underwood Law Firm, PLLC,[2] and MC&J Investments. In their complaint, Samuel and Sandra alleged: (1) Bank of America intentionally and/or negligently misrepresented that Samuel and Sandra could make their reinstatement payment prior to the start of the scheduled foreclosure in order to avoid foreclosure, (2) Defendants failed to follow Mississippi law and wrongfully proceeded with the foreclosure sale, (3) Defendants sold the property at foreclosure for legally inadequate consideration, making the foreclosure sale void, and (4) Defendants never had the legal authority to foreclose on the property. Samuel and Sandra sought "[t]o set aside the foreclosure sale as void and to vest title to the [r]eal [p]roperty as it was immediately before the wrongful sale[.]" They further sought compensatory, general, special, consequential, and punitive damages as well as reasonable costs and attorneys' fees.

¶8.    On December 6, 2020, Samuel and Sandra voluntarily dismissed without prejudice their claims against U.S. Bank, Bank of America, and Underwood Law Firm, PLLC, for their

---

[2] Underwood Law Firm, PLLC, conducted the foreclosure sale.

3

inability to serve those Defendants, leaving MC&J Investments as the only remaining Defendant.

¶9. MC&J Investments filed its answer to Samuel and Sandra's complaint and also filed a counterclaim for defamation, intentional infliction of emotional distress, violation of the Litigation Accountability Act, and negligence. Samuel and Sandra filed their response to MC&J Investments' counterclaim.

¶10. Trial was held on June 23, 2022. At trial, Samuel testified regarding an alleged oral agreement with McClinton in which McClinton agreed to buy the property at the foreclosure sale and then sell it back to Samuel. Samuel acknowledged that the alleged agreement was not reduced to writing.

¶11. The trial court entered an "Opinion and Final Judgment on Plaintiffs' Complaint against MC&J Investments, LLC and MC&J's Counterclaim against Plaintiffs" on November 18, 2022, denying Samuel and Sandra's claims against MC&J Investments and MC&J Investments' counterclaim against Samuel and Sandra. Specifically, the trial court found as follows: (1) the bid price paid by MC&J Investments did not shock the conscience of the court, (2) no writing was produced to support Samuel's claim that McClinton promised to sell him back the property, and (3) MC&J Investments failed to establish any harm or damages.

¶12. Samuel and Sandra timely appealed the trial court's denial of their claims against MC&J Investments.[3] On appeal, they argue: (1) the trial court erred by finding the statute

_____

[3] MC&J Investments did not appeal the trial court's denial of its counterclaim.

4

of frauds prevented the enforcement of a promise to sell back the property to Samuel and Sandra, and (2) the trial court erred by finding the price paid at the foreclosure sale was not so inadequate as to shock the conscience and by failing to set aside the foreclosure sale.

## DISCUSSION

  *I.*  *Whether the trial court erred by finding the statute of frauds prevented the enforcement of a promise to sell back the property to Samuel and Sandra.*

¶13. "Our statute of frauds statute, Mississippi Code Annotated section 15-3-1 (Rev. 2003), lists the types of contracts that must be in writing. Contracts for the sale of lands, tenements, or hereditaments are included." ***Thompson v. First Am. Nat'l Bank***, 19 So. 3d 784, 787 (Miss. Ct. App. 2009) (citing Miss. Code Ann. § 15-3-1(c)). Here, the alleged oral agreement between Samuel and McClinton was for the sale of property consisting of three acres of land and a house located on that land. Because the agreement involved land, it was required to be in writing. Miss. Code Ann. § 15-3-1(c) (Rev. 2019). It is undisputed that the agreement was not in writing. Accordingly, it is barred under the statute of frauds. *Id.*

¶14. Samuel and Sandra argue that even if the agreement with McClinton is subject to the statute of frauds, it is still enforceable under the doctrine of promissory estoppel.

> [A]n estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetuation of fraud or would result in other injustice.

***C.E. Frazier Constr. Co. v. Campbell Roofing & Metal Works, Inc.***, 373 So. 2d 1036, 1038 (Miss. 1979) (alteration in original) (citation omitted).

  It is universally conceded that the doctrine of equitable estoppel may be

invoked to preclude a party to a contract from asserting the unenforceability of a contract by reason of the fact that it is not in writing as required by the statute of frauds. As is often said, the statute of frauds may be rendered inoperative by an estoppel in pais. Where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the statute of frauds. This is based upon the principle established in equity, and applying in every transaction where the statute is invoked, that the statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting, or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme.

*Sanders v. Dantzler*, 375 So. 2d 774, 776 (Miss. 1979) (internal quotation marks omitted) (quoting 73 Am. Jur. 2d *Statute of Frauds* § 565).

¶15. Because the statute of frauds does not bar the enforcement of an agreement when promissory estoppel is appropriate, the real issue is whether promissory estoppel applies in this case. We find it does not.

¶16. The elements of promissory estoppel are: (1) the making of a promise, even though without consideration, (2) the intention that the promise be relied upon and in fact is relied upon, and (3) a refusal to enforce the promise would sanction the perpetuation of fraud or would result in other injustice. *C.E. Frazier Constr. Co.*, 373 So. 2d at 1038.

¶17. At trial, Samuel testified as follows:[4]

> Q.    All right. Mr. Evans, I have handed you what's been marked Plaintiff's Exhibit 3. You recognize that as the notice of sale for the foreclosure sale?
>
> A.    Yes.
>
> Q.    Okay. When did you first see that notice of sale? Do you recall?

---

[4] Sandra did not testify. In fact, the only two witnesses at trial were Samuel and McClinton.

A.     No, I don't remember now.

Q.     Okay. But that was later provided to you in the course of looking into this matter; is that right?

A.     Yes, that's right.

Q.      Okay. Now, did you know at any point in time that there was to be a foreclosure sale on January 4th of 2017?

A.     Yeah. They finally got in touch with me and told me there was going to be a sale.

Q.     Okay. Now, did you attend that sale?

A.     No. I was out of town.

Q.     Okay.

A.     But I had—they told me to send the money to them, which I did.

Q.     Again, I'm not asking for you to tell me what other people said.

A.     Okay.

Q.     But what was the reason why, without telling me what other people said, that you didn't attend this sale?

A.     I was working. I drive trucks.

Q.     Okay.

A.     I was out of town.

Q.     Okay. Did you think you needed to be at the sale or not?

A.     No. I was told not to, I didn't have to be.

Q.     Okay. Why did you think that you did not have to be at the sale?

A.     Because they had—I had sent them the money. They received the money.

Q. Okay. So you thought there was not going to be a sale?

A. Right. It was not supposed to be a sale. It was wrongfully sold, as far as I'm concerned, you know.

Q. All right. Now, when did you find out that the sale had actually proceeded?

A. Well, I want to say about two weeks later.

Q. Okay. At that point, that's when you started looking into things; is that right?

A. Right. Yeah.

. . . .

Q. All right. Mr. Evans, got a few questions for you. First of all, are you familiar with your complaint, your lawsuit you filed?

A. Which one is that?

Q. The one in this case.

A. Yeah.

Q. Okay. And in that lawsuit—can you hear me?

A. Oh, I can hear you.

Q. In that lawsuit, you allege—and I believe you've alleged today—that Bank of America was foreclosing and they told you a certain amount of money that you had to pay by January 3rd . . . and it was—I believe it was [$]9500.11 and some change. And then you said that you sent that to them and they foreclosed anyway and they sent you your money back; is that right?

A. Yeah, they sent money back later, yes.

Q. Okay. And that at the time of the foreclosure, Mr. McClinton bought the house and land at the foreclosure; is that right?

8

A. That's what was told.

Q. Okay. And what is it exactly you're saying that Mr. McClinton or MC&J has done wrong in this whole situation?

A. Well, from the start, the house was not supposed to have been sold.

Q. Okay. But what fault was that of MC&J Investments or Julious McClinton?

A. If they—I don't know if it was him or his lawyer called up there and told them that he was working on my interest to buy the house. Because we were friends and he knew I was working. I was out of town. Okay. And that's why they sold him that house.

Q. Okay.

A. Because, otherwise, they had my money up there. And I called up there, and it was already in the computer.

Q. Okay. So you're saying that Mr. McClinton called somebody and said he was working for you and that he was going to sell the house back to you?

A. I don't know if he did or the attorney, but somebody from his end did do that because it was told to me from the—

Q. Told to you by somebody else? So you don't really—

A. From Bank of America.

Q. But you don't have any proof that that happened, right?

A. Well, Bank of America didn't send me anything of it.

Q. Sir? I can't hear you.

A. No. Bank of America did not send me any paperwork on it.

Q. So you're suing Mr. McClinton because you say he was acting on your interest and he was going to give the house back to you?

9

A.   He was supposed to sell the house back to me.

Q.   Okay. Sell it back to you?

A.   Yes.

Q.   All right. Sell it back to you. Did y'all have a contract that said y'all were going to—

A.   No.

Q.    —have that transaction?

A.   No.

Q.   So there was no written contract that would—

A.   All that was talked about was just between him and me as friends.

Q.   All right. So none of this was a written contract that you allege happened that would satisfy the statute of frauds; is that right?

A.   No, it wasn't nothing like that.

Q.   Okay. So is that the only reason you're suing Mr. McClinton or is there more to it?

A.   I want my property back.

Q.   Right.

A.   That's mine.

Q.   Right.

A.   And it ain't right for nobody to try to take nothing from me.

Q.   Who tried to take something from you?

A.   Julious trying to take it, because it's my property.

Q.   Well, do you disagree that he bought it at a legal foreclosure sale?

10

A.  I sure do disagree, because that's not legal, man.

Q.  Let me ask you this: Why do you say it's not a legal foreclosure sale?

A.  Because they had—Bank of America had my money up there.

. . . .

Q.  You said that the Bank of America foreclosure was not a legal foreclosure. That's what you said earlier, correct?

A.  I did.

Q.  Okay. And then I asked you what fault was it of Mr. McClinton's or MC&J Investments that Bank of America foreclosed on you?

A.  I don't know.

Q.  Okay. So are you alleging that it was Mr. McClinton's fault that Bank of America foreclosed on you?

A.  Well, I don't know how to answer that question either.

Q.  Okay. So you don't know whether or not it was Mr. McClinton's fault; is this right?

A.  Was it his fault that he bought the property?

Q.  No, sir. Was it his fault that Bank of America foreclosed on you?

A.  No.

. . . .

Q.  I want you to look right here. Do you agree with me that that says that MC&J Investments, LLC bid [$]15,834.83?

A.  That's what it says.

Q.  And that MC&J Investments was the highest bid?

A.  Okay.

11

Q. Okay. So you agree with me that that's what the trustees deed says. So what was it about Mr. McClinton being the highest bidder that would cause him to lose this property at this time, when he did what he was supposed to do at the foreclosure sale?

A. Well, first of all, I'll go back to what I said before all the time, man. The house was not supposed to have been sold from the beginning.

Q. Right.

A. And then he did buy the house. He told the people that he was, you know, working in my interest to buy the house to sell it back to me, to get it—to keep anybody else from buying it. He said he would get it to keep anybody else from buying it because we was friends. And when I got back in town—he knew I was out of town. When I get back in town, he was going to sell me the house back.

. . . .

Q. Well, what proof do you have that that conversation happened?

A. It wasn't no proof. It was just talk, just like you and I talking now.

Q. Okay. Now—

A. We was talking as friends. I didn't know we needed to write everything down when we talked like that as friends.

. . . .

Q. So what damages are you alleging, then, against Mr. McClinton?

A. He done kept me from the house, where I couldn't do the repairs that the house needs. Like I said, now, the roof is falling in. So that needs to be fixed.

Q. Would you agree with me that Bank of America started the foreclosure?

A. They did.

Q. And would you agree with me that Julious was the highest bidder at the foreclosure?

A.    That's what the paperwork said.

Q.    And would you agree with me that at this time, Julious McClinton has a deed to that property?

A.    He might—they might have give him a deed, but it ain't right.

Q.    Well, would you agree with me that there's a trustees deed . . . that gave—that transferred that property to Mr. McClinton via MC&J?

A.    The bank gave it to him. I didn't.

Q.    Right. But you would agree with me that all of that happened as a result of something that Bank of America did, because they said that you had not paid them?

A.    That was their mistake.

Q.    Exactly. That's the point I'm trying to make. That was not Mr. McClinton's mistake. That was Bank of America's mistake, correct?

A.    If that's what the paperwork says.

Q.    Well, I'm asking you what you say.

A.    Well, I say I need to get my property back.

Q.    But you said it was Bank of America's mistake, correct?

A.    Well, I guess so.

Q.    Well, either it was or it wasn't. What is your testimony about whether or not Bank of America made the mistake in selling this at a foreclosure sale?

A.    Well, they sold it to them, Counsel. That's all I can say.

Q.    Okay. But you said that was Bank of America's mistake?

A.    That was on Bank of America.

Q.    Okay. That's not Mr. McClinton's mistake, is it?

13

A. I don't . . . .

Q. Well, he showed up on the courthouse steps and was the highest bidder, wasn't he?

A. If I had known that they was going to sell my house, I would have been there.

Q. Okay.

A. I would not have went to work, and I would have been there.

Q. But you knew there was going to be a foreclosure sale that day?

A. It was not supposed to be a foreclosure sale that day. Not on that house, no, because I sent them the money up there.

Q. Right. And if the foreclosure sale—

A. I sent them the money up there, and there it is.

Q. Yes, sir. And if the foreclosure sale went through, that was not Mr. McClinton's fault, was it?

A. I don't really know. To tell you the truth, I don't know whose fault it was.

¶18. McClinton testified that he spoke with Samuel "the day of the [foreclosure] sale, about the property." McClinton explained to Samuel that he was interested in buying the property, that he had a business partner who loaned him money, and that he repays the partner "10 percent and 1 percent a month on the money." McClinton told Samuel that he would sell Samuel the property for the sale price plus 10 percent. But according to McClinton, Samuel advised that that "was too much" and that Samuel "didn't want to pay that much." Because Samuel did not want to pay that much, McClinton purchased and kept the property.

¶19. Even if the above referenced testimony established the making of a promise between

14

Samuel and MC&J Investments/McClinton, there is no evidence that Samuel relied upon that promise. *C.E. Frazier Constr. Co.*, 373 So. 2d at 1038. As the trial court noted, "if such an agreement existed, why did [Samuel] send a certified check to Bank of America on January 3, 2017, in hopes of redeeming the [r]eal [p]roperty from foreclosure?" Moreover, Samuel testified that he did not attend the foreclosure sale because he thought his payment to Bank of America was sufficient to avoid foreclosure and redeem the property. Indeed, Samuel testified that Bank of America "received the money" and that there "was not supposed to be a [foreclosure] sale[,] [i]t was wrongfully sold, as far as [he] [was] concerned[.]" Thus, it appears Samuel relied not on any promise from McClinton but, instead, on Bank of America's alleged promise that the reinstatement payment would be sufficient to avoid foreclosure and retain the property.

¶20. Because there is no evidence that Samuel relied upon McClinton's alleged promise to sell back the property, promissory estoppel does not apply. As a result, the trial court did not err by failing to enforce the oral agreement.

> II. *Whether the trial court erred by finding that the price paid at the foreclosure sale was not so inadequate as to shock the conscience and by failing to set aside the foreclosure sale.*

¶21. The trial court found "the bid price paid by MC&J [Investments] in the amount of $15,834.83 d[id] not shock the conscience of the [c]ourt." Samuel and Sandra disagree and assert the trial court erred by finding that the price did not shock the conscience of the court and by failing to set aside the foreclosure sale.

¶22. "A legal determination of the adequacy of the purchase price is predicated upon the

15

establishment of the fair market value of the property." ***Allied Steel Corp. v. Cooper***, 607 So. 2d 113, 118 (Miss. 1992) (citing ***Haygood v. First Nat'l Bank of New Albany***, 517 So. 2d 553, 556 (Miss. 1977); ***Lake Hillsdale Ests., Inc. v. Galloway***, 473 So. 2d 461, 465 (Miss. 1985)). "The determination of the fair market value is a question for the trier of fact." ***Id.*** at 118-19 (citing ***Myles v. Cox***, 217 So. 2d 31, 34 (Miss. 1968)). "On appeal, this Court will respect the lower court's findings of fact when they are supported by reasonable evidence in the record and are not manifestly wrong." ***Id.*** at 119 (citing ***Newsom v. Newsom***, 557 So. 2d 511, 514 (Miss. 1990)).

¶23.    "We have frequently reiterated our adherence to the general rule that, absent any irregularity in the conduct of a foreclosure sale, it may not be set aside unless the sales price is so inadequate as to shock the conscience of the Court 'or to amount to fraud.'" ***Id.*** at 118 (quoting ***Wansley v. First Nat'l Bank of Vicksburg***, 566 So. 2d 1218, 1224 (Miss. 1990)). "The threshold of inadequacy, or what it takes to shock the conscience of the court, has been a somewhat imprecise standard." ***Id.*** at 120. "To shock the conscience of the Court, the bid price must be so inadequate that 'it would be "impossible to state it to a man of common sense without producing an exclamation at the inequality of it."'" ***Id.*** at 118 (quoting ***Cent. Fin. Servs., Inc. v. Spears***, 425 So. 2d 403, 405 (Miss. 1983)). "A survey of Mississippi cases concluded that the threshold of unconscionability lies around forty percent of fair market value." ***Id.*** at 120.

¶24.    Regarding the property's fair market value at the time of the foreclosure sale in 2017, Samuel presented a 1996 appraisal that valued the property at $40,000. He further testified

that he executed a deed of trust in 2003 in the amount of $40,800. While Samuel testified that he "believe[d]" the property was worth "$60,000 or more" at the time of the foreclosure sale in 2017, he failed to offer any evidence supporting such belief other than to say that the property value "always increased." But as the trial court noted,

> [Samuel] admitted that at the time of the sale he was not residing at the [r]eal [p]roperty. Additionally, he described the house on the [r]eal [p]roperty as a three bedroom, 2300-2600 square foot house. The 1996 appraisal establishes the house is 1223 feet in size. [McClinton] testified that *at the time of foreclosure sale* the house was so rundown and in need of repair that his plan after purchasing the same, was to tear the house down, split the property up, and build multiple houses.

(Emphasis added.)

¶25.    Samuel failed to present or establish the fair market value of the property at the time of the foreclosure sale in 2017. Samuel argues he did not have the burden of providing proof of the property's fair market value. While the determination of fair market value is a question for the trier of fact, such findings must be "supported by reasonable evidence in the record[.]" *Id.* at 119 (citing *Newsom*, 557 So. 2d at 514). Samuel provided no reasonable evidence to support the property's fair market value at the time of the foreclosure sale. In fact, the only evidence Samuel offered, other than his own self-serving speculation, was that the property was valued at around $40,000 *in 1996* and that he financed the property *in 2003* in the amount of $40,800. Samuel offered no evidence of a recent appraisal nor did he offer evidence of recent sales of the property. *See id.* at 120 ("Evidence of recent sales of the same property is likewise relevant to determination of the fair market value of the property." (citing *Spears*, 425 So. 2d at 405)).

17

¶26.    McClinton, on the other hand, testified that *at the time of the foreclosure sale in 2017*, the property was rundown and in need of repair.  He described the property as being overgrown to the extent that you could barely see the house.  He described the condition of the house as "junked out" and "not livable."  He explained that "[s]ome of the doors [were] missing, windows [were] missing, [the] roof [was] in bad shape."

¶27.    Based on the above referenced testimony, the trial court did not err by finding MC&J Investments' purchase price of $15,834.83 did not shock the conscience of the court.  Indeed, based on the condition of the property, the bid price was not "so inadequate that 'it would be impossible to state it to a man of common sense without producing an exclamation at the inequality of it.'"  **Id.** at 118 (internal quotation mark omitted) (quoting **Spears**, 425 So. 2d at 405).

¶28.    Samuel and Sandra argue that MC&J Investments paid "approximately thirty-eight percent of the amount financed by [them] under the deed of trust" and that "[t]hirty-eight percent is below the forty percent threshold of unconscionability[.]"  **Id.** at 120.  But Samuel and Sandra's argument assumes that the fair market value of the property at the time of foreclosure was $40,800.  And as previously discussed, there is no reasonable evidence in the record to support such a value.  **Id.** at 119 (citing **Newsom**, 557 So. 2d at 514).

¶29.    "[M]ere inadequacy of price is not sufficient to set aside a foreclosure sale unless the price is so inadequate as to shock the conscience of the court."  **Spears**, 425 So. 2d at 404 (footnote omitted).  Here, MC&J Investments bid and paid what was owed on the property.  And based on the condition of the property at the time of the foreclosure sale, MC&J

18

Investments' bid price does not shock the conscience of the court. Accordingly, the trial court did not err by failing to set aside the foreclosure sale.

## CONCLUSION

¶30.    The trial court did not err by denying Samuel and Sandra's requested relief. As a result, the trial court's final judgment is affirmed.

¶31.    **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**